2015 COA 153

The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Richard Arthur BACA, Defendant–Appellant.

Court of Appeals No. 12CA2342

Colorado Court of Appeals, Div. I.

Announced October 22, 2015

Rehearing Denied December 17, 2015

Cynthia H. Coffman, Attorney General, Erin K. Grundy, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Mark Evans, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE HARRIS

¶ 1 Richard Arthur Baca was convicted of attempt to commit and conspiracy to commit second degree murder, attempted aggravated robbery, and false reporting, in connection with an armed robbery committed by his alleged fellow gang member, Casey Griego. Mr. Baca appeals the judgment of conviction on the grounds that the district court erred in using a faulty reasonable doubt analogy during voir dire and in excluding from evidence a recorded telephone call made by Mr. Griego. He appeals his sentence on the ground that the district court erred by applying the extraordinary risk statute in calculating his sentencing range.

¶ 2 We are not persuaded by Mr. Baca's challenges to his convictions and therefore affirm the judgment of conviction. As to his sentencing claim, we agree with Mr. Baca that the district court committed error. But because the district court relied on a published decision from this court in applying the extraordinary risk provision, on plain error review we are unable to conclude that the error was obvious. We therefore affirm his sentence as well.

I. Background

¶ 3 Mr. Griego attempted to rob a liquor store at gunpoint. After exchanging gunfire with the store's clerk, Mr. Griego was shot while fleeing the store. He was then transported to the hospital and arrested. Months later, Mr. Griego and his attorney met with authorities and told them that Mr. Baca had put him up to the robbery.

¶ 4 Mr. Baca was arrested and charged with, among other offenses, attempted first degree murder, attempted aggravated robbery, conspiracy to commit first degree murder, conspiracy to commit aggravated robbery, and two counts of committing a crime of violence.

¶ 5 At trial, Mr. Griego, who was friendly with Mr. Baca's son, testified that he met Mr. Baca for the first time on the day of the attempted robbery, and had spent much of the afternoon drinking and smoking marijuana with Mr. Baca and his son. According to Mr. Griego, it was Mr. Baca's idea to rob the liquor store. Mr. Griego tried to resist, but after Mr. Baca pressured him and called him a "bitch," Mr. Griego relented. He maintained that Mr. Baca had provided the bandana and gun used in the attempted robbery.

¶ 6 Mr. Baca's defense was that Mr. Griego had committed the robbery not at Mr. Baca's behest, but as part of a gang initiation ritual. To be admitted to the Bloods gang, Mr. Griego had to "do something crazy" or, in gang terminology, "do some dirt." And according to Mr. Baca, the armed robbery was the "dirt" required for Mr. Griego to join the Bloods.

¶ 7 The jury convicted Mr. Baca of attempted second degree murder, conspiracy to commit second degree murder, attempted aggravated robbery, and conspiracy to com-

mit aggravated robbery for his role in planning and encouraging Mr. Griego's commission of the offense. The jury acquitted Mr. Baca of the crime of violence charges, finding, by way of a special verdict, that the prosecution had failed to prove that Mr. Baca used, or possessed and threatened the use of, a deadly weapon.

¶ 8 At sentencing, after applying both the crime of violence and the extraordinary risk sentencing provisions, the court calculated Mr. Baca's sentencing range at ten to thirty-two years. The court sentenced Mr. Baca to eighteen years' imprisonment.

## II. Reasonable Doubt Voir Dire Comments

¶ 9 In a colloquy with potential jurors during the court's voir dire, the court explained:

In this case, the burden is beyond a reasonable doubt, the highest burden we have in our legal system, but what it doesn't say is proof beyond any doubt, because, I suppose, folks can have doubts about just about anything, including—I don't know how you got here. I suppose you drove. When you got in your car this morning—we all read about these terrible things that happen when they're driving, either they make a mistake or somebody else does, and it ends up very tragic. That didn't stop you from making the decision to get up, turn your key, and come to work, and that didn't stop you to [sic] from coming here, did it?

THE JUROR: (Shakes head.)

THE COURT: I'm going to ask you to hold the prosecution to beyond a reasonable doubt. Can you do that?

THE JUROR: Yes.

¶ 10 Before the attorneys began their voir dire, the court read the pattern reasonable doubt instruction to the potential jurors. This instruction was read to the jury again at the close of evidence, and a written copy was provided in the jury's packet of instructions.

¶ 11 Mr. Baca contends that the court's reasonable doubt analogy violated his due process rights by lowering the prosecution's burden of proof and allowing the jury to convict on something less than proof beyond a reasonable doubt.

¶ 12 Mr. Baca failed to object to the court's comments. He asserts, however, that the comments constitute structural error, requiring automatic reversal. We do not agree and, instead, review for plain error. *People v. Lee*, 93 P.3d 544, 550 (Colo.App.2003) (rejecting contention that structural error review applied to claim of allegedly erroneous reasonable doubt instruction and applying plain error standard); *see also People v. Carter*, 2015 COA 24M, ¶ 51, —— P.3d —— (applying plain error review to allegation of erroneous reasonable doubt instruction). We reverse under this standard only if the error was obvious and "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *People v. Miller*, 113 P.3d 743, 750 (Colo.2005) (quoting *People v. Sepulveda*, 65 P.3d 1002, 1006 (Colo.2003)). An error in giving an improper jury instruction does not constitute plain error if the relevant instruction, read in conjunction with other instructions, adequately informs the jury of the law. *Id.*

¶ 13 We assume without deciding that the district court's comments on the reasonable doubt standard were improper and that the comments amounted to instructions. Even if the trial court's analogy was improper, however, we perceive no plain error, as the court's isolated comments do not cast doubt on the reliability of the judgment of conviction.

¶ 14 The court twice read the proper reasonable doubt instruction to the jury and provided it with a written copy. Considering the improper analogy in conjunction with the other reasonable doubt instructions, we conclude that the jury was adequately informed of the law, and we presume the jury followed these instructions. *Copeland v. People*, 2 P.3d 1283, 1288 (Colo.2000) ("Absent evidence to the contrary, we presume that the jury understood and heeded the trial court's instructions."); *see also Carter*, ¶ 59 (stating that an improper analogy during voir dire was not reversible error where the court orally provided the proper reasonable doubt instruction twice and it was provided in written instructions); *People v. Estes*, 2012 COA

41, ¶ 12, 296 P.3d 189 ("[T]he risk of prejudice [from improper comments during voir dire] was mitigated by the court's written jury instructions and other statements correctly explaining the applicable burdens and presumptions, and we presume that the jury followed the court's instructions.").

¶ 15 Mr. Baca relies on a number of cases from other jurisdictions to argue that the court's comments constitute reversible error. *See, e.g., People v. Johnson,* 119 Cal.App.4th 976, 14 Cal.Rptr.3d 780 (2004); *Commonwealth v. Ferreira,* 373 Mass. 116, 364 N.E.2d 1264 (Mass.1977). These cases, however, present far more extreme examples than the analogy at issue here. In *Johnson,* the court engaged in a lengthy colloquy with several prospective jurors, analogizing a series of different everyday decisions to reasonable doubt, and then told the prospective jurors that they would have to be "brain dead" if, at the end of trial, they had no doubts about the defendant's guilt. 14 Cal. Rptr.3d at 782. Similarly, in *Ferreira,* the court compared the reasonable doubt standard to the level of certainty people have when making economic and social decisions, encouraging the jurors to "weigh the pros and cons." 364 N.E.2d at 1272. Unlike the instructions in *Johnson* and *Ferreira,* the comments at issue here were brief, made in passing, and followed shortly by the correct reasonable doubt instruction.

¶ 16 Therefore, the court's comments on reasonable doubt do not require reversal.

III.  Admission of Recorded Telephone Call

¶ 17 To bolster his theory of defense, Mr. Baca sought to introduce a recorded telephone call between Mr. Griego, who was in jail awaiting sentencing in his case, and Mr. Griego's mother, in which Mr. Griego apparently admitted that he had "done his dirt" to become a Blood. Mr. Baca attempted to introduce the call during testimony from Mr. Griego and, when that proved unsuccessful, during the testimony of a defense investigator, but the court ultimately excluded the recording. Mr. Baca contends the court abused its discretion in refusing to admit the telephone call.

¶ 18 We review evidentiary rulings, including foundation and authentication rulings, for an abuse of discretion. *People v. Bernard,* 2013 COA 79, ¶ 8, 305 P.3d 433. The parties disagree on the proper standard to apply in the event of an error—Mr. Baca says constitutional harmless error and the People say plain error—but we need not settle that dispute because we discern no error by the district court.

A.  Introduction of Recording During Testimony of Mr. Griego

¶ 19 Defense counsel initially attempted to introduce the call during Mr. Griego's cross-examination. After Mr. Griego denied telling his mother that he had "done his dirt" to become a Blood, defense counsel attempted to impeach Mr. Griego with his recorded statements.

¶ 20 As a prerequisite to publishing the call, the district court required authentication of the recording and its admission as an exhibit. Defense counsel had headphones and a compact disk player available for authentication, but she did not have the call saved in a format that could be readily admitted as an exhibit. Defense counsel and the court then had the following exchange:

COUNSEL: Okay. So I can't impeach him with that specific statement? I mean, he could deny it or he could admit it, but I could impeach him with it.

THE COURT: You might be able to if someone else can authenticate it.

COUNSEL: Okay.

¶ 21 At that point, counsel again asked Mr. Griego if he had told his mother that he was a Blood and had done his "dirt," but she did not attempt to have Mr. Griego listen to and authenticate the telephone call. Mr. Griego again denied making the statement.

¶ 22 While the record is far from clear, we interpret counsel's question to the court as a request to allow Mr. Griego to use the headphones to listen to and authenticate the call, outside the hearing of the jury, so that, regardless of whether the call was eventually admitted as an exhibit, Mr. Griego could "deny" or "admit" that he had made the contested statements. The court's response

suggests that it may have misunderstood the nature of defense counsel's request.

¶ 23 No matter the source of the confusion, the result was an ambiguous answer to counsel's question, which does not qualify as a ruling. *Cf. People v. Rodriguez*, 209 P.3d 1151, 1160 (Colo.App.2008) (finding that court "withheld ruling" on counsel's request because response that counsel was "welcome to [his] opinion" was ambiguous) (alteration in original), *aff'd*, 238 P.3d 1283 (Colo.2010). When a trial court's response to a request from defense counsel is ambiguous, it is "incumbent upon defendant to press for a definitive ruling before being able to claim on appeal that the court somehow erred." *Id.*; *see also Feldstein v. People*, 159 Colo. 107, 111, 410 P.2d 188, 191 (1966), *abrogated on other grounds by Deeds v. People*, 747 P.2d 1266 (Colo.1987); *People v. Young*, 923 P.2d 145, 149 (Colo.App.1995).

¶ 24 Defense counsel apparently interpreted the court's response to her request to play the recording as a denial and chose not to follow through with her attempt to use the call to impeach Mr. Griego. Before we can find error with respect to the introduction or exclusion of evidence, the court must be presented with a concrete request for a particular ruling. *Feldstein*, 159 Colo. at 111, 410 P.2d at 191. Because the court never ruled on whether defense counsel could impeach Mr. Griego with the recorded call, we cannot conclude that an error occurred.

### B. Introduction of Recording During Testimony of Defense Investigator

¶ 25 Defense counsel then attempted to admit the call during the testimony of a defense investigator. During his testimony, the investigator explained that he had obtained the recorded telephone call from the Adams County Jail and had redacted the relevant portion of the recording. However, the investigator was neither a party to nor present during the call, and he did not create the recording. The prosecution objected to admission of the recording, and the court sustained the objection. We agree with the district court that the defense investigator could not have provided the proper foundation for admission of the recorded telephone call.

¶ 26 Authentication is a condition precedent to admissibility. *People v. Crespi*, 155 P.3d 570, 576 (Colo.App.2006). Under CRE 901, this condition is satisfied by evidence "sufficient to support a finding that the matter in question is what its proponent claims." CRE 901(a). To lay the proper foundation for the authentication of a recorded telephone call, then, the proponent must demonstrate that the recording is an accurate reproduction of the call that occurred. *Alonzi v. People*, 198 Colo. 160, 163, 597 P.2d 560, 562 (1979).

¶ 27 Traditionally, this standard required the proponent of a recording to verify both the content of the telephone call and the process by which it was recorded. The former burden could be satisfied with testimony from a percipient witness—either a party to the call or someone who had listened in as the call was recorded—while the latter burden required a witness who could testify to the "competency of the operator, the fidelity of the recording equipment, the absence of material deletions, additions, or alterations in the relevant portions of the recording, and the identification of the relevant speakers." *Id.* (quoting *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir.1977)).

¶ 28 More recently, courts have allowed for admission of a recorded call when the proponent presents a witness who can vouch *either* for the accuracy of the content of the call *or*, if no such witness is available, for the reliability of the recording process. *See, e.g.*, *United States v. Buzzard*, 540 F.2d 1383, 1386 (10th Cir.1976) (holding that testimony of party to conversation confirming completeness of recording was sufficient to lay foundation for admission); *Johnson v. State*, 823 So.2d 1, 24–25 (Ala.Crim.App.2001) (stating that testimony of party to call confirming accuracy of recording was sufficient to lay foundation); *People v. Fonville*, 35 Cal. App.3d 693, 111 Cal.Rptr. 53, 62 (1973) ("[T]he usual way of laying a foundation for the playing of a recording is to call one of the participants or a monitor to testify that the conversation was accurately recorded.");

*People v. Ely,* 68 N.Y.2d 520, 510 N.Y.S.2d 532, 503 N.E.2d 88, 92 (1986) (explaining that testimony of a participant or witness that a recording is a complete and accurate reproduction of conversation is a "well-recognized way[ ]" to lay sufficient foundation); *see also* Roxanne Bailin et al., Colorado Evidentiary Foundations § 4.F (2d ed. 2008) (noting that modern courts find testimony of a percipient witness "has sufficient probative value standing alone to authenticate [an audio] tape").

¶ 29 In this way, the requirements for the admission of a recorded call are much like those for admission of a photograph or videotape. The proponent of the evidence need only establish that the exhibit is an accurate reproduction of a scene—or, in the case of a telephone call, of sounds or words—with which the witness is familiar. *See* CRE 901(b)(1); *see also People v. Armijo,* 179 P.3d 134, 137–138 (Colo.App.2007); 2 McCormick On Evidence § 216, at 44 (Kenneth S. Broun ed., 7th ed.2013).

¶ 30 If no witness with independent knowledge of the content of the telephone call can verify the accuracy of the recorded conversation, the proponent must instead present a witness who can verify the reliability of the recording process, by establishing the factors laid out in *Alonzi*: the competency of the recorder, the reliability of the recording system, the absence of any tampering with the recording, and the identification of the speakers. *See People v. Sangster,* 380 Ill.Dec. 574, 8 N.E.3d 1116, 1127 (Ill.App.Ct. 2014) ("[A] recording may be admitted without the testimony of a witness with personal knowledge of what the recording portrays as long as there is sufficient proof of the reliability of the process that produced the recording."); McCormick On Evidence at § 216, 44 ("If no witness testifies that he overheard the crucial information being recorded, then the record must be authenticated by the 'silent witness' process; that is, testimony concerning the accuracy of the recording system and the absence of tampering[.]").

¶ 31 The defense investigator was not a percipient witness—he did not hear the conversation as it occurred. Accordingly, he could not vouch for the accuracy of the recorded conversation.

¶ 32 To lay a sufficient foundation, he therefore had to be able to vouch for the reliability of the recording process. But he could not. The investigator testified that he did not create the recording, and he did not provide any testimony about how the recording was made or about the reliability of the jail's recording system. Rather, he simply requested various files and recordings related to Mr. Griego from the Adams County Jail and then redacted the relevant telephone recording to produce a distillation of the conversation between Mr. Griego and his mother. He did not testify that the recording had not been tampered with before he received it. Thus, the investigator did not have sufficient information to authenticate the recording. *See* Jordan S. Gruber, Annotation, *Foundation for Audio Recordings as Evidence,* 23 Am.Jur. Proof of Facts 3d 315, § 49 (1993) ("[T]he witness through whom the foundation is laid does not have to be a percipient witness to the recording ... however ... the witness must be shown to have firsthand knowledge about the matter to which he is about to testify[.]" (internal quotation marks omitted)).

¶ 33 Evidence of the reliability of the recording process can be supplied by a witness who did not create the recording, but that witness must have personal knowledge of the recording method. Typically, a proponent lays the foundation for a recorded jail call by having an employee of the jail or department of corrections testify about the reliability of the recording system and the method with which the recording at issue was retrieved. *See, e.g., United States v. Harris,* 338 Fed.Appx. 892, 893 (11th Cir. 2009) (finding foundation established by department of corrections' communications coordinator, who was responsible for the inmate phone system and testified that all inmate phone calls are automatically recorded and these recordings can be copied but not altered); *Lowe v. State,* 310 Ga.App. 242, 712 S.E.2d 633, 635–36 (2011) (holding the foundation established by testimony of employee of sheriff's office familiar with jail procedures and specially trained in monitoring and

searching for recorded calls); *Sangster*, 8 N.E.3d at 1127 (stating that foundation established by department of corrections employee, who testified about the reliability of the jail telephone and recording system and that she was trained to use the recording system); *State v. Falkins*, 146 So.3d 838, 854 (La.Ct.App.2014) (ruling that foundation established by testimony from custodian of evidence of local sheriff's office). The investigator had no relationship with the Adams County Jail and could not testify about the jail's method of recording and retrieving telephone calls.

¶ 34 Because the defense investigator could neither verify the accuracy of the recorded conversation's content nor the reliability of the recording process, we conclude that the district court did not abuse its discretion by refusing to admit the recording into evidence.

## IV. Extraordinary Risk Sentencing

¶ 35 In sentencing Mr. Baca on his convictions for attempted second degree murder and conspiracy to commit second degree murder, the district court applied both the crime of violence and extraordinary risk statutes, which yielded a sentencing range of ten to thirty-two years. The court imposed concurrent terms of eighteen years' imprisonment.

¶ 36 Mr. Baca does not dispute that attempted second degree murder and conspiracy to commit second degree murder are crimes of violence, subject to the enhanced penalties in section 18–1.3–406(1)(a), C.R.S. 2015. He contends, however, that the district court erred in also applying the penalty for extraordinary risk crimes. Only certain crimes of violence—where the defendant used, or possessed and threatened the use of, a deadly weapon or inflicted seriously bodily injury or death—trigger extraordinary risk sentencing, he argues.

¶ 37 We interpret the extraordinary risk sentencing provision de novo. But because Mr. Baca failed to object at sentencing, we review his claim that the court erred in computing his sentencing range for plain error. *See People v. Wylie*, 260 P.3d 57, 60 (Colo. App.2010).

### A. Extraordinary Risk Sentencing Provision

¶ 38 We agree with Mr. Baca that the district court erred in applying the extraordinary risk sentencing provision. In so holding, we disagree with a division of this court, which previously concluded that because attempted second degree murder is a crime of violence it is necessarily an extraordinary risk crime. *See People v. Laurson*, 70 P.3d 564 (Colo.App.2002).

¶ 39 The extraordinary risk statute incorporates the crime of violence statute, and therefore we begin by briefly examining the definition of a crime of violence. An offense can qualify as a "crime of violence" in one of two ways. First, under section 18–1.3–406, a crime of violence is defined as any of the enumerated offenses during the commission of which the defendant used, or possessed and threatened the use of, a deadly weapon or caused serious bodily injury or death to a non-participant. § 18–1.3–406(2)(a).

¶ 40 Additionally, some offenses have been designated by the legislature as crimes of violence for sentencing purposes. For these offenses, the statute describing the substantive offense directs the court to sentence "in accordance with" the crime of violence statute. These crimes are referred to as "per se crimes of violence." Some, but not all, per se crimes of violence also meet the statutory definition of a crime of violence in section 18–1.3–406(2)(a) because they have as an element the use, or possession and threatened use of, a deadly weapon or the infliction of serious bodily injury or death. *See, e.g.,* § 18–3–203(1)(b),(2)(c)(I), C.R.S.2015 (stating that a person commits second degree assault when, with intent to cause bodily injury, he causes bodily injury to another person by means of a deadly weapon and, upon conviction, he must be sentenced "in accordance with" section 18–1.3–406).

¶ 41 Attempted second degree murder and conspiracy to commit second degree murder are class 3 felonies, subject to a presumptive sentencing range of four to twelve years. § 18–1.3–401(1)(a)(V)(A), C.R.S. 2015. Those offenses are also per se crimes of violence,

§§ 18–2–101(3.5), 18–2–201(4.5), C.R.S. 2015; *see also Terry v. People,* 977 P.2d 145, 151 (Colo.1999) (stating that conspiracy to commit a per se crime of violence is itself a per se crime of violence). Consequently, under section 18–1.3–406(1)(a), the court was required to sentence Mr. Baca to at least the midpoint in the presumptive range, eight years, but no more than twice the maximum, twenty-four years.

¶ 42 But the district court also applied the extraordinary risk sentencing provision, which increased Mr. Baca's sentencing range to ten to thirty-two years. Under section 18–1.3–401(10)(b)(XII), certain crimes qualify as extraordinary risk crimes, including crimes of violence "as defined in" section 18–1.3–406.

¶ 43 The supreme court has interpreted "as defined in" to encompass only those crimes of violence that satisfy the definitional criteria in section 18–1.3–406(2)(a). *See People v. Banks,* 9 P.3d 1125, 1131 (Colo.2000). According to the court, in an effort to separate more culpable from less culpable conduct, the legislature intentionally selected only those crimes defined in the crime of violence statute, and not per se crimes of violence, for enhanced extraordinary risk sentencing. *Id.*

¶ 44 *Banks* involved the offense of second degree assault on a peace officer. *See* § 18–3–203(1)(c). There was no allegation that the defendant had used a deadly weapon during the commission of the offense or that the officer had suffered serious bodily injury. The prosecution argued that because second degree assault on a peace officer was a per se crime of violence that required sentencing under the crime of violence statute, it was also a crime of violence for purposes of extraordinary risk sentencing. The court disagreed, concluding that the language "as defined in" limited the type of violent crimes eligible for extraordinary risk sentencing to crimes that satisfied the statute's definitional criteria. 9 P.3d at 1131–32.

¶ 45 A per se crime of violence may be subject to extraordinary risk sentencing, however, if it has as an element one or both of the statutory crime of violence criteria, *see People v. Trujillo,* 169 P.3d 235, 237 (Colo.App.2007) (finding offense qualified as extraordinary risk crime "because it is a per se crime of violence *that requires proof of serious bodily injury and the use of a deadly weapon*") (emphasis added), or if the prosecution separately pleads and proves the statutory criteria. *Banks,* 9 P.3d at 1131–32 & n. 10.

¶ 46 At sentencing, the district court correctly characterized Mr. Baca's attempted second degree murder and conspiracy to commit second degree murder convictions as per se crimes of violence. However, relying on *Laurson,* the court then concluded that the offenses necessarily constituted extraordinary risk crimes. We agree with the district court that *Laurson* appears to stand for the proposition that any conviction of attempted second degree murder, whether or not it involves the use, or possession and threatened use of, a deadly weapon or results in serious bodily injury or death, constitutes an extraordinary risk crime. But we cannot square that proposition with the holding and analysis in *Banks* and, therefore, we respectfully decline to follow *Laurson.*

¶ 47 In *Laurson,* the defendant filed a postconviction motion challenging his extraordinary risk sentencing for a conviction of solicitation to commit second degree murder. He contended that because solicitation to commit second degree murder is not listed in the crime of violence statute, it cannot qualify as an extraordinary risk crime. 70 P.3d at 566–67.

¶ 48 The *Laurson* division first noted that criminal solicitation is treated as criminal attempt for sentencing purposes. *Id.* at 566. It then determined that because second degree murder is a "defined" crime of violence (that is, it meets the statutory criteria under section 18–1.3–406) an attempt to commit second degree murder is also a "defined" crime of violence, and thus subject to extraordinary risk sentencing. For this latter proposition, the division relied on section 18–2–101(3.5). *Id.* at 567.

¶ 49 We read section 18–2–101(3.5) to mean that an attempt to commit a per se crime of violence is itself a per se crime of

violence. Section 18–2–101(3.5) instructs that "[c]riminal attempt to commit any crime for which a court is required to sentence a defendant for a crime of violence in accordance with section 18–1.3–406 is itself a crime of violence for the purposes of that section." Under *Banks* and *Terry*, the language "in accordance with" denotes a per se crime of violence, not a crime of violence "as defined in" section 18–1.3–406. *See Banks*, 9 P.3d at 1130–31; *Terry*, 977 P.2d at 149. Moreover, the crime of violence statute itself dictates that an attempt or conspiracy to commit a "defined" crime of violence is itself a "defined" crime of violence only where the attempt or conspiracy involves the use, or possession and threatened use of, a deadly weapon or results in serious bodily injury or death.

¶ 50 For these reasons, we are unpersuaded by the People's argument that the statute's phrase, "for purposes of," establishes that attempt is a defined crime of violence under section 18–1.3–406. As the supreme court concluded in *Terry*, those crimes for which a court is required to sentence a defendant "in accordance with" the crime of violence statute are per se crimes of violence and, therefore, the "import of being a crime of violence *for purposes of*" the crime of violence statute is that conspiracies or attempts "should receive mandatory violent crime sentencing," 977 P.2d at 149–50 (emphasis added) (internal quotation marks omitted), not that conspiracies and attempts are defined crimes of violence.

¶ 51 Thus, as relevant here, an attempt to commit second degree murder (second degree murder being both a per se crime of violence, see § 18–3–103(4), C.R.S.2015, and a "defined" crime of violence) is a per se crime of violence for sentencing purposes. But under Banks, attempted second degree murder is a crime of violence "as defined in" section 18–1.3–406 only if it meets that statute's definitional criteria.

¶ 52 Neither attempted second degree murder nor conspiracy to commit second degree murder has as an element one of the definitional criteria set forth in the crime of violence statute. See §§ 18–2–101, 18–3–103 (stating that elements of attempted second degree murder are that the defendant (1) acted with the kind of culpability otherwise required for commission of second degree murder, which is "knowingly," and (2) engaged in conduct constituting a substantial step toward the commission of second degree murder, which is to "cause[ ] the death of a person"); §§ 18–2–201, 18–3–103 (stating that elements of conspiracy to commit second degree murder are that the defendant (1) with the intent to promote or facilitate its commission (2) agrees with another person or persons that they, or one or more of them, will commit second degree murder).

¶ 53 Therefore, the prosecution had to separately plead and prove at least one of these statutory requirements. The prosecution charged two crime of violence counts, but the jury acquitted Mr. Baca of those charges, specifically finding that the prosecution had failed to prove Mr. Baca's use, or possession and threatened use of, a deadly weapon in connection with either attempt or conspiracy to commit second degree murder. And it was undisputed that the offenses did not result in serious bodily injury or death to any non-participant.

¶ 54 Accordingly, Mr. Baca was not convicted of a crime of violence "as defined in" section 18–1.3–406. The court therefore erred in applying the extraordinary risk sentencing provision to calculate Mr. Baca's sentencing range.

### B. Plain Error

¶ 55 This determination does not end our inquiry, however. Mr. Baca did not raise the sentencing issue in the district court. So we cannot vacate the sentence unless the error amounted to plain error. *See People v. Banark*, 155 P.3d 609, 611 (Colo.App.2007).

¶ 56 We acknowledge that in other cases, once we have concluded that the trial court misapprehended the scope of its discretion in imposing a sentence, we have remanded for resentencing. *See, e.g., People v. Linares-Guzman*, 195 P.3d 1130, 1137 (Colo.App.2008); *People v. Willcoxon*, 80 P.3d 817, 822 (Colo.App.2002). But those cases do not include any discussion of preservation of the error or the applicable standard of review,

and thus they do not provide guidance here. Instead, we apply the general rule that all unpreserved errors, both constitutional and nonconstitutional, are reviewed for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116.

¶ 57 Plain error is error that is obvious and substantial. An error is obvious if, under current law, the error was so clear-cut that the trial judge should have been able to avoid it without benefit of objection. *People v. Pollard*, 2013 COA 31M, ¶ 12, 307 P.3d 1124.

¶ 58 We conclude that, in the absence of an objection, the district court reasonably relied on *Laurson*. Although *Banks* established a clear rule for the application of the extraordinary risk sentencing provision, *Laurson* was issued after *Banks*, and the supreme court denied certiorari review in *Laurson*. The *Laurson* division acknowledged *Banks*' general holding, but it saw no inconsistency between that holding and the division's holding. *Laurson* addressed a situation very similar to Mr. Baca's and, under C.A.R. 35(f), the district court was obliged to follow it.

¶ 59 Under these circumstances, we conclude that the error was not obvious. *See People v. Valdez*, 2014 COA 125, ¶ 27, —— P.3d —— (where case law on an issue is unsettled, an error is not obvious); *Pollard*, ¶ 40 (stating that, ordinarily, for an error to be obvious, it must contravene a clear statutory command, a well-settled legal principle, or Colorado case law). Therefore, the district court's erroneous application of the extraordinary risk sentencing provision in computing Mr. Baca's sentencing range did not amount to plain error.[1]

### C. Conclusion

¶ 60 The judgment and sentence are affirmed.

Taubman and J. Jones, JJ., concur

---

1. We also note that, although Mr. Baca should not have been subject to extraordinary risk sentencing, his sentence of eighteen years' imprisonment is within the proper sentencing range.