COLORADO COURT OF APPEALS                                    **2017COA115**

Court of Appeals No. 14CA0586
Boulder County District Court No. 13CR1092
Honorable Patrick D. Butler, Judge
Honorable Thomas F. Mulvahill, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Michael A. Camarigg,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE GRAHAM
J. Jones and Welling, JJ., concur

Announced September 7, 2017

Cynthia H. Coffman, Attorney General, Joseph G. Michaels, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Karen Mahlman Gerash,
Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1      Defendant, Michael A. Camarigg, appeals the judgment of conviction entered on jury verdicts finding him guilty of driving under the influence of alcohol (DUI); careless driving; and possessing chemicals, supplies, or equipment with intent to manufacture methamphetamine.  We affirm.

## I.      Background

¶ 2      After defendant was arrested for DUI, officers decided to impound his Jeep because it was parked in front of a gas pump at a gas station.  The officers conducted an inventory search of the vehicle and discovered a sealed box containing items commonly used in the manufacture of methamphetamine.  Based on those items, they obtained a warrant to search the Jeep and found additional items used to manufacture meth.

¶ 3      The People charged defendant with DUI; careless driving; and possession of chemicals, supplies, or equipment with intent to manufacture methamphetamine.  A jury convicted him of all charges.

## II.    Motion to Suppress

¶ 4     Defendant first argues that the trial court should have excluded evidence discovered in the inventory search of his Jeep and under the subsequently issued warrant.  We disagree.

### A.    Additional Facts

¶ 5     After stopping defendant on suspicion of DUI, Corporal Jonathan Bomba of the Lafayette Police Department called a DUI officer to complete the DUI investigation and arrest.  Once defendant was placed under arrest, Corporal Bomba began an inventory search of the Jeep so it could be impounded.  Corporal Alex Grotzky later arrived and assisted with the inventory search.

¶ 6     In the cargo area, Corporal Grotzky found a gasoline canister and a transmission fluid container with tubes coming out of them. These items "kind of piqued [his] attention as possibly something that could be used in meth manufacturing."  He also found a United States Postal Service (U.S.P.S.) box addressed to "Jayne McCoy" in Idaho Springs, from a return address in Arizona without a name. Corporal Grotzky cut the box open and discovered drain cleaner, leaking hydrochloric acid, a glass beaker, and pH testing strips. Recognizing these items as consistent with methamphetamine

manufacturing, Corporal Grotzky called a hazardous materials team to determine if the Jeep was an active meth lab. The hazmat team determined it was not an active lab, and the Jeep was impounded. A search warrant was later issued, and officers discovered additional items consistent with the manufacture of methamphetamine.

¶ 7    Defendant moved to suppress evidence obtained from the inventory search and under the warrant. He argued that the officers had options other than impounding his Jeep and that the inventory search was not conducted according to a policy that sufficiently curtailed police discretion, but, instead, permitted general rummaging. He also asserted that the evidence obtained under the warrant was tainted because the warrant was based on evidence found in the allegedly unconstitutional inventory search.

¶ 8    The prosecution argued that the officers acted reasonably in impounding defendant's Jeep because other options were impractical under the circumstances. The prosecutor also argued that the inventory search was valid because department policy required officers to open sealed containers found in an inventory search.

¶ 9    The Lafayette Police Department manual provided that

> [a]ll property in a stored or impounded vehicle shall be inventoried and listed on the vehicle storage form.  This includes the trunk and any compartments or containers, even if they are closed and/or locked.  Members conducting inventory searches should be as thorough and accurate as practicable in preparing an itemized inventory. . . .
>
> If the apparent potential for damage to a locked container reasonably appears to outweigh the protection of the items inside, other options to consider regarding locked containers include, but are not limited to, obtaining access to the locked container from the owner, placing the locked container into safekeeping or obtaining a written waiver of responsibility for the contents of the locked container.

¶ 10    Corporal Grotzky testified at the suppression hearing that he did not make the decision to impound defendant's Jeep, but factors likely informing that decision included the following:

- Impounding a vehicle "is common practice with a DUI where you don't want the person to get booked and released and go out and drive the vehicle."

- The officers "[did not] have permission from [the gas station] owner to leave the car there."

4

- The Jeep "was parked kind of in a unique position in front of a gas pump where it would have been a nuisance."

- Defendant's passenger "had admitted to Corporal Bomba that she had consumed alcohol" and had left the scene by the time Corporal Grotzky arrived.

¶ 11 Corporal Grotzky further explained that he elected to open the sealed U.S.P.S. box because, while "[t]here's some discretion within our policy" whether to open closed containers, he "wanted to make sure that there were no . . . valuable items that [he] . . . [or] the tow truck driver would be responsible for, [and] that the defendant could [not] come back and claim that [he] . . . [or] the tow truck driver [had] damaged or broken [defendant's property]." Corporal Grotzky believed cutting the tape on the box would not damage it, and he "figured if . . . they needed to put a new piece of tape on it afterwards it wouldn't be a big issue."

¶ 12 The trial court concluded that the Jeep was lawfully impounded and the inventory search was conducted according to standard policy. The court found no evidence of pretext because while officers had some discretion in whether to impound a vehicle,

there were "some coherent and reasonable reasons" why other options were impractical. The court also found that "the determination to do an inventory search [was made] . . . before there was any evidence or even suspicion by the officer that there would be some sort of illegal items found inside." Thus, the court denied defendant's motion to suppress.

### B. Standard of Review and Applicable Law

¶ 13 We review a trial court's ruling on a motion to suppress as a mixed question of fact and law. *People v. Parks*, 2015 COA 158, ¶ 7. We defer to the court's factual findings if they are supported by the record, but we review its conclusions of law de novo. *Id.*

¶ 14 Unreasonable searches violate the United States and Colorado Constitutions. U.S. Const. amend. IV; Colo. Const. art. II, § 7. Warrantless searches are presumptively unconstitutional unless an exception to the warrant requirement applies. *Parks*, ¶ 10. Inventory searches are one exception. *Id.* Inventory searches "are designed to protect the owner's property while it is in police custody, to insure against claims concerning lost or damaged property, and to protect the police from any danger posed by the contents of the vehicle." *Pineda v. People*, 230 P.3d 1181, 1185

(Colo. 2010), *disapproved of on other grounds by People v. Vaughn*, 2014 CO 71.

¶ 15    Inventory searches are reasonable if (1) the vehicle was lawfully taken into custody, *id.*; (2) the search was conducted according to "an established, standardized policy," *Vaughn*, ¶ 14; and (3) there is no showing police acted in bad faith or for the sole purpose of investigation, *Pineda*, 230 P.3d at 1185.

¶ 16    A vehicle is lawfully taken into custody if the seizure is authorized by law and department regulations and is reasonable. *People v. Brown*, 2016 COA 150, ¶¶ 14-15 (*cert. granted* July 3, 2017); *People v. Gee*, 33 P.3d 1252, 1255-57 (Colo. App. 2001).

¶ 17    The inventory search must then be conducted according to a standardized procedure so as not to become "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990).  Police discretion is permitted in conducting the search "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Id.* at 3-4 (quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)).  "The policy or practice governing inventory searches should be designed to

produce an inventory," *id.* at 4, not as "a purposeful and general means of discovering evidence of crime," *id.* (quoting *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring)).  The policy need not be in writing, so long as it is routinely used by officers.  *Brown*, ¶ 16.

¶ 18 Finally, when assessing whether an inventory search was pretextual, the officer's subjective motives are irrelevant.  *Vaughn*, ¶ 11 n.7.  Instead, we ask whether the officer's actions were objectively reasonable under the circumstances.  *Pineda*, 230 P.3d at 1185.

## C.    Decision to Impound

¶ 19 Defendant does not challenge the officers' legal authority to impound his Jeep after his DUI arrest but instead argues that they had options other than impounding the vehicle, such as allowing a third party to take custody or leaving the Jeep where it was.  We are not persuaded that the decision was unreasonable.

¶ 20 First, whether the officers had other options besides impounding defendant's Jeep is not controlling; the question is whether the decision was objectively reasonable.  *See Vaughn*, ¶ 15 ("That [the officer] was not *required* to arrest [the defendant] for driving with a suspended license — and could have issued a

summons instead — is irrelevant, as [the defendant's] arrest was both permissible and objectively reasonable.").

¶ 21 Second, evidence adduced at the suppression hearing indicates that the decision to impound was reasonable. Defendant's passenger admitted she had been drinking, so officers could have reasonably decided she was incapable of safely operating the Jeep. She also left the scene before Corporal Grotzky arrived, indicating that she had determined not to stay with defendant and that she may not have been willing to take custody of the vehicle anyway. The officers lacked permission to leave the Jeep parked on the private property of the gas station owner, where it was blocking a gas pump and likely to be a nuisance. And department policy prohibited officers from moving a vehicle unless it was "an imminent danger to the safety of other motorists." Defendant, having been arrested for DUI, certainly could not have moved the Jeep himself. Each of these considerations was appropriately based on public safety rather than a desire to investigate. *See Brown*, ¶¶ 13-14 (stating that police may impound vehicles at their discretion "in furtherance of 'public safety'" but "not to obtain evidence") (citation omitted).

¶ 22   Accordingly, we agree with the trial court that the officers properly took custody of defendant's Jeep.

### D.   Department Procedure

¶ 23   Defendant also argues that the inventory search was not conducted according to standard department procedures that sufficiently curtailed officer discretion.  Again, we disagree.

¶ 24   First, whether Corporal Grotzky was motivated by some investigative curiosity is not controlling.  *See Gee*, 33 P.3d at 1255. The question is whether his actions were objectively reasonable.  *Id.*

¶ 25   Department policy instructed officers to open all containers unless the potential for damage was significant.  Having determined that the potential for damage was minimal, Corporal Grotzky acted according to policy when he opened the U.S.P.S. box in defendant's Jeep.

¶ 26   The discretion granted to Corporal Grotzky in making that decision was appropriate because it tailored his discretion according to standard criteria unrelated to criminal suspicion. Instead, the criteria were designed to further the purposes of an inventory search — protecting property while in police custody.

¶ 27    Thus, we agree with the trial court that Corporal Grotzky's decision to open the box was reasonable.

## E.    Pretext

¶ 28    Finally, to the extent defendant suggests that the officers impounded his Jeep and conducted an inventory search as pretext for criminal investigation, we disagree.

¶ 29    The only evidence defendant points to that would suggest pretext was Corporal Grotzky's testimony that his curiosity was "piqued" by items consistent with the manufacture of methamphetamine before he opened the U.S.P.S. box. However, as the trial court noted, the decision to impound defendant's Jeep was made before there was any suspicion of illegal items inside. And since department policy instructed officers to open all containers found during an inventory search unless the potential for damage was too great, a reasonable officer in Corporal Grotzky's position would have made the same decision, his individual curiosity notwithstanding. *See Pineda*, 230 P.3d at 1185.

¶ 30    Therefore, we agree with the trial court that the search was not pretextual.

## F.     The *Counterman* Case

¶ 31     Finally, we reject defendant's suggestion that under *People v. Counterman*, 192 Colo. 152, 556 P.2d 481 (1976), the search was improper because the purposes of the inventory search could have been accomplished without opening the box.  First, *Counterman* is no longer good law.[1]  Second, the question is not whether the purposes of the inventory search could be satisfied by a narrower search, *see Bertine*, 479 U.S. at 374 ("The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means." (quoting *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983))), but whether the search was reasonable.  Third, the purposes of an inventory search would *not* have been satisfied by merely noting the existence of the

---

[1] *People v. Counterman* held that the inventory search of a knapsack found in an impounded vehicle was unconstitutional under the United States and Colorado Constitutions.  192 Colo. 152, 157-58, 556 P.2d 481, 485 (1976).  However, "under federal constitutional standards *Counterman* is no longer valid." *People v. Parks*, 2015 COA 158, ¶ 21 (quoting *People v. Inman*, 765 P.2d 577, 579 n.4 (Colo. 1988)).  And subsequent decisions of our supreme court have made clear that the Colorado and United States Constitutions offer coextensive protections in the context of inventory searches. *See id.* at ¶ 22.  Hence, *Counterman* is no longer valid under either constitution.

sealed box in this case because it contained hazardous chemicals, which could have threatened police or public safety. *See South Dakota v. Opperman*, 428 U.S. 364, 373 (1976) ("It would be unreasonable to hold that the police, having to retain the car in their custody . . . , had no right, even for their own protection, to search it." (quoting *Cooper v. California*, 386 U.S. 58, 61-62 (1967))).

¶ 32 Therefore, we agree with the trial court that the inventory search was constitutional.

## G. Taint

¶ 33 Because we conclude that the inventory search was constitutional, evidence obtained under the subsequently issued warrant could not have been tainted.

## III. Prosecutorial Misconduct

¶ 34 Defendant next argues that the prosecutor improperly quantified the concept of reasonable doubt and lowered the burden of proof by using a puzzle analogy during closing argument. We are not convinced this was prosecutorial misconduct, but even if it was, it was harmless beyond a reasonable doubt.

## A.    Additional Facts

¶ 35    In closing, the prosecutor argued that the circumstantial evidence showed that defendant knew what was inside the U.S.P.S. box in his Jeep and that he possessed those items with the intent to manufacture methamphetamine.  Defense counsel asserted in closing that defendant did not know what was in the box, defendant did not know how to manufacture methamphetamine, and all of the items in the box had innocent uses.  Thus, defense counsel argued, evidence of defendant's guilt was merely speculative and the prosecution had not proven the possession with intent to manufacture meth charge beyond a reasonable doubt.

¶ 36    In rebuttal, the prosecutor used a puzzle analogy to explain how the circumstantial evidence was sufficient proof beyond a reasonable doubt:

> [W]hen you look at this case, think about reasonable doubt like it's a puzzle, and that the pieces of this case are a puzzle that you are putting together.
>
> And when you look at a puzzle you've got — you start to put together your pieces.  So first of all, you've got a piece here, which is this was the defendant's car.  He was driving it.  He owned it.  You saw some insurance paperwork in his — in his car.

14

So we know that the car belonged to him, that he drives this car, that it's his. It isn't like he was driving a friend's car or something like. This is his own property.

You keep adding up the pieces of the puzzle; that he's driving drunk and he admits to that, but he does everything that he can to steer the cops away from the car.

You put in some other pieces of a puzzle. And you have another one that we know that there's nothing in the car that was necessarily or obviously illegal. Had some of these officers not had the training that they had, somebody might have overlooked this and said hey, this isn't something that's illegal.

So he was trying to steer the cops away from something that he knew in his mind was illegal. But there wasn't anything else that they found because we have talked about drugs or things like that.

And again, you put together the pieces of the puzzle, there were items not just inside that box, but outside the box. Some of the tubing and the containers and the gas can were found outside the box.

Keep adding the pieces of the puzzle, and you look at the proximity. Everything was in the trunk, and a lot of the items were together in that box.

So again, if you have some pH papers in a drawer in your desk and you have some drain cleaner under your bathroom sink, the two aren't probably mixing, right.

But when you've got all of those items in a box together and there's no other reason to have those items in a box together, it's probably there because you're making methamphetamine.

Keep adding the piecing [sic] of the puzzle. And again, look at why is this stuff mailed in the first place, right. If you could just go to Home Depot or McGuckin's [Hardware] and buy it, why does somebody in Nevada have to ship that to somebody in Idaho Springs; some filter papers, some pH papers. So kind of look at just the suspicious circumstances of that.

Remember what Detective Holdstock told you yesterday, that with his training and his experience dealing with people shipping drugs and things like that over the mail that maybe they're sending it to a fake name, fake address. Maybe they're sending it to somebody who doesn't know what's coming and somebody is going to intercept it.

So just look at the suspicious nature of that package in and of itself. There's a name and an address of the sender — or excuse me, the receiver. But the sender didn't even put their name on there, just an address in Arizona.

And then lastly you put the pieces together and let's use our common sense in this case. . . .

Common sense, if somebody who is driving a car, it's their own car, people know what's in your car, people know what's in the packages in their car. So use your common sense when you think about the evidence that you heard in this case.

16

So reasonable doubt is a puzzle. We have a puzzle up here, and we filled in the pieces. And each of you might have other pieces of the puzzle that you would fill in. But you look at this puzzle, and [there are] a couple of items that are still missing or a couple of pieces of the puzzle that haven't been filled in.

When you look at this puzzle and you see what it is, it's a tiger; right? No doubt, proof beyond a reasonable doubt that that is a tiger that you're looking at.

¶ 37    Defense counsel objected, arguing that the prosecutor's analogy was "inaccurate as to reasonable doubt." The court overruled the objection but instructed the jury that "the law that applies to this case is in the instructions that I've read to you and that each of you have."

¶ 38    The prosecutor then concluded:

And my purpose in putting this up is what I talked about, right. Reasonable doubt is not all doubt. It's not beyond a shadow of a doubt. It's a doubt that would cause reasonable people to hesitate to act in matters of importance to them.

Are you going to hesitate to say that that's a tiger even though all the pieces aren't filled in? No.

So . . . look at the evidence, look at what you heard yesterday, the photographs that you saw.

17

> And when you look at everything, it tells you beyond a reasonable doubt that the defendant is guilty of the charges.

### B.    Standard of Review and Applicable Law

¶ 39    We review a trial court's ruling on prosecutorial misconduct for "a gross abuse of discretion resulting in prejudice and a denial of justice." *People v. Garner*, 2015 COA 175, ¶ 26 (quoting *People v. Rhea*, 2014 COA 60, ¶ 42) (*cert. granted* Oct. 17, 2016).

¶ 40    A prosecutor may not "misstate the evidence or the law, attempt to inflame the jurors' passions or prejudices, or offer a personal opinion as to the defendant's guilt." *People v. Krueger*, 2012 COA 80, ¶ 50.

¶ 41    Only one published case in Colorado has addressed the analogy of the reasonable doubt standard to a puzzle. *See People v. Carter*, 2015 COA 24M-2, ¶¶ 50-61. In that case, the trial court told jurors during voir dire that if they had a jigsaw puzzle with some pieces missing, which showed

> a white building with a part of a red roof and the rest of the roof structure is not there . . . part of a fence that goes around but then part of that's missing . . . [and] half of, what looks like . . . a house . . . [,] I suspect that . . . you might be able to figure out that there's a barn and a corral and a house there, even if you

18

> can't see it all, that might be enough proof
> beyond a reasonable doubt.

*Id.* at ¶ 54. The prosecutor later referred to that analogy during closing arguments, telling the jurors that "you consider everything together. It's a puzzle." *Id.* at ¶ 56. The prosecutor went on to recite certain pieces of evidence and told the jury to put those pieces together. *Id.* Because the *Carter* defendant did not object, a division of this court reviewed the comments for plain error. *Id.* at ¶ 51. The division assumed without deciding that the comments were erroneous, but it concluded that they were not plain error. *Id.* at ¶ 58.

¶ 42 Here, defendant did object, so we review for reversible error, not plain error. Because the *Carter* division assumed error and applied the plain error standard of reversal, and because other Colorado cases involving the dilution of the burden of proof have also applied a plain error standard, Colorado law provides little insight on when a prosecutor's burden of proof analogy constitutes reversible error. *See People v. Baca,* 2015 COA 153, ¶¶ 9-16 (reviewing trial court's analogy of reasonable doubt standard to driving a car for plain error); *People v. Boyd,* 2015 COA 109, ¶¶ 7-

13 (reviewing trial court's comments on reasonable doubt and presumption of innocence for plain error); *People v. Hill*, slip op. at 12-16 (Colo. App. No. 14CA0585, Sept. 1, 2016) (not published pursuant to C.A.R. 35(e)) (reviewing prosecutor's analogy of reasonable doubt to a puzzle for plain error); *People v. Opana*, slip op. at 9-12 (Colo. App. No. 10CA1987, May 29, 2014) (not published pursuant to C.A.R. 35(f)) (same)

¶ 43    However, courts in other jurisdictions have provided guidance. Analogizing reasonable doubt to an incomplete puzzle may be permissible when used to explain the difference between proof beyond all doubt and proof beyond a reasonable doubt, *see Adcock v. State*, 933 N.E.2d 21, 27-28 (Ind. Ct. App. 2010) (holding that analogy to a puzzle missing pieces "was used to highlight the difference between 'beyond a reasonable doubt' and 'beyond all possible doubt'" and did not violate the defendant's due process rights); *State v. Jackson*, 305 P.3d 685, 692 (Kan. Ct. App. 2013) (finding that analogy of the presumption of innocence to a blank canvas and the state's burden to put enough paint on the canvas that the jury could recognize the picture beyond a reasonable doubt, even if painting was not complete, was within the wide

20

latitude afforded prosecutors), or when used to explain how the evidence at trial will come together, *State v. Berube*, 286 P.3d 402, 412 (Wash. Ct. App. 2012) ("The puzzle analogy is an apt description of a trial, given that evidence is heard not in logical or chronological order but in order of witness knowledge.").

¶ 44    Even so, puzzle analogies can be problematic in several ways. First, they can be improper if they quantify the concept of reasonable doubt. *See United States v. Pungitore*, 910 F.2d 1084, 1128 (3d Cir. 1990) (The prosecution's analogy of its case to a five-hundred-piece puzzle with eight pieces missing "improperly suggested a quantitative measure of reasonable doubt."); *People v. Katzenberger*, 101 Cal. Rptr. 3d 122, 127 (Cal. Ct. App. 2009) (stating that the prosecutor's use of an image depicting an eight-piece puzzle with six pieces in place inappropriately suggested the reasonable doubt standard could be quantified); *Lord v. State*, 806 P.2d 548, 552 (Nev. 1991) (suggesting argument that having ninety to ninety-five percent of the pieces of a puzzle was sufficient proof of guilt beyond a reasonable doubt "improperly quantified the concept"); *State v. Lindsay*, 326 P.3d 125, 131-32 (Wash. 2014) (finding the prosecutor's argument that "[y]ou could have 50

percent of those puzzle pieces missing and . . . know [a puzzle depicts] Seattle" improperly quantified reasonable doubt).

¶ 45    Second, puzzle analogies can inappropriately trivialize the state's burden. *See Berube*, 286 P.3d at 412 ("The problem arises when the analogy is used to trivialize the State's burden under the reasonable doubt standard.").

¶ 46    Third, using a puzzle analogy to equate the burden of proof to an everyday choice can be improper. *See State v. Curtiss*, 250 P.3d 496, 509 (Wash. Ct. App. 2011) ("[C]losing arguments comparing 'the certainty people often require when they make everyday decisions . . . trivialize[] and ultimately fail[] to convey the gravity of the State's burden and the jury's role in assessing its case against [the defendant].'" (quoting *State v. Anderson*, 220 P.3d 1273, 1281 (Wash. Ct. App. 2009))); *cf. State v. Fuller*, 282 P.3d 126, 142 (Wash. Ct. App. 2012) (deciding that puzzle analogy was not reversible error where the prosecution did not "equat[e] its burden of proof to making an everyday choice").

¶ 47    And finally, puzzle analogies are problematic if they use iconic images, which invite the jury to jump to a conclusion about a defendant's guilt. *See Katzenberger*, 101 Cal. Rptr. 3d at 127

22

(deciding that the prosecutor's use of a partially completed puzzle depicting the Statue of Liberty "invite[d] the jury to guess or jump to a conclusion, a process completely at odds with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt," because "most jurors would recognize the image well before" the image was complete and "might guess the picture is of the Statue of Liberty when the first or second piece[s]" were in place); *People v. Wilds*, 529 N.Y.S.2d 325, 327 (N.Y. App. Div. 1988) (The trial court's analogy to a puzzle depicting Abraham Lincoln diminished the prosecution's burden of proof because "the average American juror would recognize a jigsaw puzzle of Abraham Lincoln, long before all of the pieces are in place. Obviously, this is not the quantum of proof required in a criminal case.").

¶ 48     The parties disagree whether the prosecutor's analogy should be reviewed for harmless error or constitutional harmless error. *See Hagos v. People*, 2012 CO 63, ¶¶ 9-12 (stating that preserved errors that affect a defendant's constitutional rights are subject to constitutional harmless error review, while trial errors that do not directly affect a defendant's constitutional rights are subject to harmless error analysis). We need not resolve that question.

23

Although we are not persuaded that the prosecutor's argument specifically and directly offended defendant's constitutional due process rights, *see People v. Flockhart*, 2013 CO 42, ¶ 20 ("Only those errors 'that specifically and directly offend a defendant's constitutional rights are "constitutional" in nature.'") (citation omitted), we conclude that there is no reasonable possibility the prosecutor's analogy contributed to defendant's conviction, *see Hagos*, ¶ 11 (stating that under constitutional harmless error review, a reviewing court must reverse if there is a reasonable possibility that the error contributed to the defendant's conviction).

## C.    Analysis

¶ 49     The prosecutor used a puzzle analogy for purposes that other courts have found permissible: to convey the difference between proof beyond a reasonable doubt and proof beyond all doubt, and to explain how the circumstantial evidence fit together to support the prosecution's case.  *See Adcock*, 933 N.E.2d at 27-28; *Jackson*, 305 P.3d at 692; *Berube*, 286 P.3d at 412.  The prosecutor used the verbal imagery to emphasize that while the jury might want additional information, the circumstantial evidence was sufficient to find guilt beyond a reasonable doubt.  *See Jackson*, 305 P.3d at 693

(deciding that the prosecutor did not act improperly in analogizing case to an incomplete painting to explain "that the prosecutor's burden was not one to show proof beyond all doubt" and did not "attempt to diminish the State's burden").

¶ 50    Furthermore, the prosecutor did not use the analogy to improperly quantify or trivialize the State's burden. The prosecutor did not suggest the People had provided some specific portion of a puzzle or that the reasonable doubt standard would be satisfied when a certain percentage of the puzzle was provided. *Cf. Pungitore*, 910 F.2d 1084; *Katzenberger*, 101 Cal. Rptr. 3d at 127; *Lord*, 806 P.2d 548; *Lindsay*, 326 P.3d at 134-36. Instead, the prosecutor used the analogy to rebut the defense argument that evidence of defendant's guilt was speculative. *See People v. Santana*, 255 P.3d 1126, 1132 (Colo. 2011) ("[T]he more a prosecutor is legitimately responding to questions and arguments raised by defense counsel, the less likely it is the prosecutor intended to shift the burden of proof.").

¶ 51    While the comparison was potentially problematic because the image of a tiger might be recognizable "long before all of the pieces are in place," *Wilds*, 529 N.Y.S.2d at 327, we nevertheless conclude

25

that there is no reasonable possibility the metaphor contributed to defendant's conviction.  First, a tiger is not so iconic as to be immediately recognizable, in contrast to images of the Statue of Liberty, *Katzenberger*, 101 Cal. Rptr. 3d at 127, the State of California, *People v. Otero*, 148 Cal. Rptr. 3d 812, 816-18 (Cal. Ct. App. 2012), or Abraham Lincoln, *Wilds*, 529 N.Y.S.2d at 327, of which courts have disapproved.  Second, in contrast to more problematic cases, the prosecutor did not display a partial image of a tiger.  *Cf. Otero*, 148 Cal. Rptr. 3d at 816-18 (prosecutor displayed image of California and asked what state it was); *Katzenberger*, 101 Cal. Rptr. 3d at 127 (prosecutor displayed image of partially completed puzzle depicting Statute of Liberty).  The generic verbal comparison was not so specific that the jury could have immediately conjured an image of a tiger and thus been encouraged to jump to conclusions about defendant's guilt.  *Cf. Katzenberger*, 101 Cal. Rptr. 3d at 127 (finding that image of puzzle depicting Statute of Liberty "le[ft] the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence" and thus "invite[d] the jury to guess or jump to a conclusion").  Instead, the prosecutor merely recited a long list of circumstantial evidence,

26

analogous to putting the pieces of a puzzle together, in direct rebuttal to defense counsel's argument that the evidence against defendant was speculative and did not prove his guilt. *See People v. Gibson,* 203 P.3d 571, 578 (Colo. App. 2008) ("[I]t was permissible for the prosecutor to argue that the sum of the circumstances was more than mere coincidence.").

¶ 52    Finally, the jury was properly instructed on the reasonable doubt standard and the State's burden to prove each element of the charges beyond a reasonable doubt; the court reminded the jurors of these standards when defense counsel objected to the prosecutor's analogy; and, after the objection, the prosecutor repeated the correct formulation of reasonable doubt to the jury. *See People v. Bowring,* 902 P.2d 911, 921 (Colo. App. 1995) (deciding that the prosecutor's statements did not deprive the defendant of a fair trial where the jury was properly instructed on the law and reminded by the court of those instructions during the prosecutor's objectionable comments).

¶ 53    Under these circumstances, any impropriety in the prosecutor's analogy was harmless beyond a reasonable doubt.

## IV.   Sufficiency of the Evidence

¶ 54    Lastly, defendant contends there was insufficient evidence he intended to manufacture methamphetamine.  We disagree.

### A.   Standard of Review and Applicable Law

¶ 55    We review the record de novo to determine if there is sufficient evidence to sustain a defendant's conviction.  *People v. Leverton*, 2017 COA 34, ¶ 56.  We ask "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the charge beyond a reasonable doubt."  *Id.* at ¶ 53.

### B.   Analysis

¶ 56    Defendant argues that there was insufficient evidence he intended to manufacture methamphetamine because (1) the items he possessed were legal and had legitimate uses; (2) there was no evidence he knew how to manufacture meth; (3) he did not possess items "essential" to manufacturing meth; and (4) there was no evidence he knew what was in the U.S.P.S. box.

¶ 57    However, defendant disregards rational inferences a juror could make in favor of the prosecution from the circumstantial

28

evidence. For example, a juror could conclude defendant knew what was in the U.S.P.S. box because most people know what items are in their vehicles. Likewise, a juror could conclude defendant knew how to and intended to manufacture methamphetamine based on the close proximity of the supplies, the containers with tubes coming out of them (which an officer testified could be used in the production of the drug), the suspicious circumstances of having legal items shipped from an anonymous out-of-state address, and defendant's attempts to keep the officers away from his vehicle.

¶ 58    That the record contains other evidence that could support a contrary conclusion does not change the fact that there was sufficient evidence to support the jury's conclusion. *See People v. Thornton*, 251 P.3d 1147, 1149 (Colo. App. 2010) ("The prosecution is entitled to the benefit of every reasonable inference that may fairly be drawn from the evidence, *even if the record also contains evidence to the contrary*.") (emphasis added) (citations omitted); *People v. Carlson*, 72 P.3d 411, 416 (Colo. App. 2003) ("Where reasonable minds could differ, the evidence is sufficient to sustain a conviction.").

¶ 59    It was the jury's role to determine what weight and significance to attribute to the evidence, *see Leverton,* ¶¶ 62-63, and, viewed in the light most favorable to the prosecution, there was sufficient circumstantial evidence from which a rational jury could conclude beyond a reasonable doubt that defendant intended to manufacture methamphetamine.

V.    Conclusion

¶ 60    The judgment of conviction is affirmed.

JUDGE J. JONES and JUDGE WELLING concur.