Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
September 14, 2020

**2020 CO 71**

**No. 19SC292,** *Gonzales v. People*—Authentication—Audio Recordings—
**Evidence.**

The supreme court considers the appropriate standard for authenticating
voice recordings for admission into evidence and holds that, in the absence of
evidence suggesting that a proffered voice recording has been altered or
fabricated, a proponent may authenticate a recording by presenting evidence
sufficient to support a finding that it is what the proponent claims. Once this
prima facie burden is met, authenticity becomes a question for the factfinder.
Accordingly, the supreme court affirms the judgment of the court of appeals.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2020 CO 71

### Supreme Court Case No. 19SC292
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 16CA750

### Petitioner:

Daniel J. Gonzales,

v.

### Respondent:

The People of the State of Colorado.

### Judgment Affirmed
*en banc*
September 14, 2020

**Attorneys for Petitioner:**
Megan A. Ring, Public Defender
Jessica Sommer, Deputy Public Defender
    *Denver, Colorado*

**Attorneys for Respondent:**
Philip J. Weiser, Attorney General
Melissa D. Allen, Senior Assistant Attorney General
    *Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.

¶1 After the victim's murder in this case, his sister-in-law discovered a peculiar microcassette among his belongings. On that cassette was a recording of a potentially incriminating voicemail message. A police detective later testified at trial that the message featured a voice like that of the defendant, Daniel J. Gonzales, whom the detective had interviewed while investigating the murder.

¶2 Over Gonzales's objection, the court admitted the recorded message into evidence at Gonzales's trial. It did so based in part on the detective's identification of Gonzales's voice. But the detective was not present when the recorded statements were made, and neither he nor anyone else testified about the reliability of the recording process. Even so, after considering the recording and other evidence, a jury found Gonzales guilty of, among other things, first degree murder.

¶3 We agreed to consider whether the trial court was right to admit the recording based on this type of voice authentication. In doing so, we have the benefit of two well-crafted but divergent opinions from two divisions of the court of appeals.

¶4 On the one hand, there is *People v. Baca*, 2015 COA 153, 378 P.3d 780. Starting with CRE 901 but then relying on precedent that predates this court's adoption of that rule, *Baca* holds that testimony by a percipient witness or a witness who can vouch for the reliability of the recording process is necessary to authenticate a

2

voice recording. *Id.* at ¶¶ 26–27, 30, 378 P.3d at 786–87. Gonzales contends that the prosecution failed to comply with *Baca*, and consequently, the trial court abused its discretion in admitting the voicemail.

¶5 On the other, there is the division below, which rejects this categorical rule in favor of a more versatile approach. *People v. Gonzales*, 2019 COA 30, __ P.3d __. *Gonzales* concludes that CRE 901's language, including its illustrations, contemplates a flexible, fact-specific inquiry and undercuts *Baca*'s reliance on older precedent. *Id.* at ¶¶ 14–16, 19–21.

¶6 We agree with the *Gonzales* division. In the absence of evidence suggesting that a proffered voice recording has been altered or fabricated, we hold that a proponent may authenticate a recording by presenting evidence sufficient to support a finding that it is what the proponent claims. CRE 901(a). Once this prima facie burden is met, authenticity becomes a question for the factfinder, in this instance, the jury.

¶7 Applying this standard here, we conclude that the trial court did not abuse its discretion in admitting the voicemail. We therefore affirm the judgment of the court of appeals.

## I. Facts and Procedural History

¶8 In a recorded interview with two police detectives, Gonzales recounted the following events that culminated in his arrest and prosecution for the murder of the victim, F.C.

¶9 Gonzales once lived on the same street as F.C. When Gonzales was a teenager, he and a friend broke into F.C.'s house. Gonzales was attracted to F.C. and searched for clues that F.C. was gay. Along the way, he also stole some of F.C.'s electronics and clothing.

¶10 Gonzales later moved out of the neighborhood. But over a decade later, he broke into F.C.'s house again. This time, he grabbed a knife from F.C.'s kitchen and waited for F.C. to return home.

¶11 When F.C. returned, Gonzales stabbed him several times in the neck, killing him. He then sexually assaulted F.C.'s body, stole some of F.C.'s personal effects, and attempted to burn F.C.'s corpse and house. Then, he fled.

¶12 When law enforcement eventually caught up to him, they arrested and interviewed him. During this interview, Gonzales confessed to killing F.C.

¶13 Gonzales was charged with first degree murder (after deliberation), abuse of a corpse, stalking, first degree arson, first degree burglary, aggravated robbery, and first degree murder (felony murder).

4

¶14 Following F.C.'s death, his sister-in-law helped sift through his belongings. While going through F.C.'s office space, she came across a microcassette tape in a folded-up piece of cardboard. It was attached to some papers that seemed to be related to a prior burglary of F.C.'s home.

¶15 She later listened to the tape and discovered it was from a phone answering machine. The tape contained a few messages from F.C.'s friends. Then, she stumbled upon the voicemail at issue here. Because she thought it might have some evidentiary value, she turned the tape over to one of the detectives working on the case.

¶16 The case eventually proceeded to trial. At trial, the prosecution asked F.C.'s sister-in-law about the voicemail. She described how she found the microcassette tape in F.C.'s house and determined that it contained voicemail messages. She verified that the prosecution's copy of the voicemail was the same as the message she had listened to on the tape.

¶17 The prosecution also questioned one of the detectives who interviewed Gonzales. The detective explained that he converted the microcassette tape to a CD using a digital voice recorder. After watching the video interview with Gonzales, listening to Gonzales's voice, and listening to the voice on the voicemail, the detective concluded that the voice on the voicemail sounded "consistent or similar to Mr. Gonzales'[s] voice."

¶18 At this point, defense counsel objected based on improper expert opinion. Without squarely addressing that objection, the prosecutor responded that "voice authentication is an acceptable way to lay foundation for a voice recording." He also cited CRE 901. The trial court overruled the objection.

¶19 Before the prosecutor moved to admit the voicemail into evidence, the detective testified that the recording was a "phone message to [F.C.]." He also confirmed that the recording was the same as the voicemail on the microcassette tape. When the prosecution moved to admit the voicemail, defense counsel objected based on a lack of foundation and hearsay. The trial court overruled the objection, and the prosecution played the voicemail for the jury:

> Hey [F.C.], um, it's me the guy who has your pajamas and the jeans that fit you. Uh, I suppose I am going to give you back your stuff. Only the pajamas and the jeans that fit you. Um. So I will give you a call tomorrow between eight-thirty and nine o'clock. And uh, that's pretty much all I can say until I talk to you over the phone. Good[]bye [F.C.].[1]

¶20 The jury found Gonzales guilty as charged, and the court sentenced Gonzales to life in prison without the possibility of parole.

---

[1] Because there's no transcript of the voicemail, we borrow this description from the prosecution's answer brief. Based on our review of the admitted sound recording, this is an accurate description of the recording played for the jury.

¶21 Gonzales appealed, challenging, among other things, the trial court's admission of the voicemail. He contended that the trial court abused its discretion in admitting the voicemail because the prosecution failed to authenticate the recording according to one of the methods required by *Baca*. In other words, he claimed that the prosecution did not establish an adequate foundation for the voicemail's admission.

¶22 A division of the court of appeals disagreed and declined to follow *Baca*. *Gonzales*, ¶ 2. It reasoned that *Baca* heavily relied on a decision of this court, *Alonzi v. People*, 597 P.2d 560 (Colo. 1979), and other authorities, that predated this court's adoption of the Colorado Rules of Evidence. *Gonzales*, ¶¶ 11, 17. It further noted that the language and structure of CRE 901 do not support exclusive methods for authenticating voice recordings. *Id.* at ¶ 20. Although the division observed that the factors outlined in *Baca* could be relevant in some circumstances, "particularly when there is a colorable claim that a recording has been altered," it determined that CRE 901 contemplates a flexible, fact-specific inquiry in deciding whether a jury could reasonably determine that a proffered voice recording is what its proponent claims. *Id.* at ¶¶ 21, 22. It therefore rejected *Baca*'s categorical approach and concluded that courts "must consider all relevant circumstances that bear on whether a recording is what it purports to be." *Id.* at ¶ 30.

7

¶23 Applying this standard here, the division concluded that the prosecution presented enough evidence to support a finding that the voicemail was what the prosecution claimed—a voicemail from Gonzales to F.C. *Id.* at ¶ 31. Thus, the division determined that the trial court did not abuse its discretion in admitting the voicemail. *Id.* at ¶ 32.

¶24 Gonzales then petitioned this court for certiorari review. We granted his petition to resolve the division split between *Gonzales* and *Baca*.[2]

## II. Analysis

### A. Standard of Review

¶25 We review a trial court's evidentiary ruling for an abuse of discretion. *Campbell v. People*, 2019 CO 66, ¶ 21, 443 P.3d 72, 76. "A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair." *Id.*

¶26 In deciding whether the trial court abused its discretion in admitting the voicemail, we must first determine what CRE 901 requires before a voice recording may be admitted into evidence. The interpretation of a rule of evidence is a question of law, which we review de novo. *See People v. Zhuk*, 239 P.3d 437, 438

---

[2] We granted certiorari to review the following issue:

> Whether a voice recording may be admitted into evidence when there is no witness who can vouch for either the accuracy of the recording's contents or the reliability of the recording process.

(Colo. 2010); *People v. Reed*, 216 P.3d 55, 56 (Colo. App. 2008). And we interpret rules of evidence consistent with principles of statutory construction. *See Buell v. People*, 2019 CO 27, ¶ 19, 439 P.3d 857, 861. We therefore give a rule's language its "commonly understood and accepted meaning." *Id.*; *see also Reed*, 216 P.3d at 57. "If the rule is unambiguous, we apply it as written." *Buell*, ¶ 19, 439 P.3d at 861.

## B. CRE 901 Provides a Flexible Standard

¶27 Before a voice recording may be admitted into evidence, it must be authenticated.[3] CRE 901(a). The burden to authenticate "is not high—only a prima facie showing is required." *People v. Glover*, 2015 COA 16, ¶ 13, 363 P.3d 736, 740 (quoting *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014)). Accordingly, the trial court, as the evidentiary gatekeeper, must determine "whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *Id.* (quoting *Hassan*, 742 F.3d at 133); *see also* CRE 104(a) (explaining that the court determines foundational questions related to the admissibility of evidence).

---

[3] Of course, authenticity alone does not guarantee admissibility. 22 Stephen A. Hess & Sheila K. Hyatt, *Colorado Handbook on Evidence*, Rule 901 cmt. 1, Westlaw (database updated Oct. 2019). Evidence must also satisfy rules governing relevance and must not be excludable under other bars to admission, such as hearsay. Put simply, authentication is necessary, but insufficient, for the admission of evidence. *Id.*

9

¶28 This foundational requirement is governed by CRE 901. Under this rule, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." CRE 901(a). The balance of the rule provides several illustrations that serve as "examples of authentication or identification conforming with the requirements of this rule." CRE 901(b).

¶29 One of these illustrations is voice identification. CRE 901(b)(5). According to this illustration, a party may authenticate evidence through "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." *Id.*

¶30 Because the rule's plain language instructs that a proponent need only provide sufficient evidence to support a finding that the proffered evidence is what the proponent claims, the rule vests trial courts with broad discretion to consider a variety of foundational circumstances depending on the nature of the proffered evidence. The rule does not prescribe any exclusive method for authenticating evidence.

## C. CRE 901 Controls and Does Not Prescribe Exclusive Methods for Authenticating Voice Recordings

¶31 Still, Gonzales contends that a proponent of a voice recording must establish (1) the identity of the speaker and (2) the recording's accuracy. To satisfy the

second prong, Gonzales argues that the proponent must present prima facie evidence of accuracy through either the testimony of a percipient witness (someone who participated in the call or listened to the call as it was recorded) or evidence of the reliability of the recording process. He argues that *Alonzi* and *Baca* provide the proper framework for authenticating voice recordings. We disagree.

¶32 In *Alonzi*, the trial court admitted recordings of several telephone conversations between the defendant and an undercover agent of the Colorado Bureau of Investigation. 597 P.2d at 561–62. The defendant contended that the recordings should have been excluded because the prosecution did not establish an adequate chain of custody. *Id.* at 562.

¶33 In deciding the "requirements that must be met in order to lay a proper foundation for the admission of tape recordings into evidence," this court "note[d] with approval" the test set out in *United States v. Biggins*, 551 F.2d 64 (5th Cir. 1977). *Alonzi*, 597 P.2d at 562. According to *Biggins*, a trial court "properly admits a sound recording into evidence only when the party introducing it carries its burden of going forward with foundation evidence demonstrating that the recording as played is an accurate reproduction of relevant sounds previously audited by a witness." *Id.* (quoting *Biggins*, 551 F.2d at 66). In a criminal trial, this requires the prosecution to establish "the competency of the operator, the fidelity of the recording equipment, the absence of material deletions, additions, or alterations

11

in the relevant portions of the recording, and the identification of the relevant speakers." *Id.* (quoting *Biggins*, 551 F.2d at 66).

¶34 We concluded that authenticating a tape recording does not require the proponent to establish a chain of custody. *Id.* Still, we noted that it is "incumbent on the proponent of the tape recording to produce clear and convincing evidence of authenticity and accuracy" and that the prosecution is required to establish with "a reasonable degree of certainty, that no such tampering took place." *Id.* at 562–63.

¶35 But we announced *Alonzi* before we adopted the Colorado Rules of Evidence. *See People v. Ramirez*, 155 P.3d 371, 375 (Colo. 2007) ("The Colorado Rules of Evidence were adopted by this court on October 23, 1979, and became effective January 1, 1980."). And the rules govern the authentication and admissibility of evidence in Colorado courts. CRE 901(a); CRE 1101(a) (noting the rules apply to all courts in Colorado). So, we implicitly abrogated *Alonzi* when we adopted CRE 901, and CRE 901 now controls. *See Ramirez*, 155 P.3d at 378.

¶36 Nevertheless, absent a more explicit renunciation, the *Baca* division leaned heavily on *Alonzi*. In *Baca*, the defendant sought to introduce a recorded jail call, but the trial court excluded the call. ¶¶ 17, 25, 378 P.3d at 785, 786. On appeal, the division agreed with the trial court. *Id.* at ¶ 34, 378 P.3d at 788. Citing *Alonzi*, the division reasoned that to "lay the proper foundation for the authentication of a

12

recorded telephone call," the "proponent must demonstrate that the recording is an accurate reproduction of the call that occurred." *Id.* at ¶ 26, 378 P.3d at 786. To establish this foundation, the proponent must present testimony from either (1) a percipient witness who can verify the recording's accuracy or (2) a witness who can vouch for the reliability of the recording process. *Id.* at ¶¶ 27, 28, 30, 378 P.3d at 786–87. If the proponent takes the second path, the witness must verify the reliability of the recording process by satisfying the *Biggins* factors, as laid out in *Alonzi*: "the competency of the recorder, the reliability of the recording system, the absence of any tampering with the recording, and the identification of the speakers."[4] *Id.* at ¶ 30, 378 P.3d at 787. Because the defendant's foundational witness could neither verify the accuracy of the recording's content nor vouch for the reliability of the recording process, the division concluded that the trial court properly excluded the call. *Id.* at ¶ 34, 378 P.3d at 788.

---

[4] Although *Biggins* prescribes these foundational factors, it nevertheless clarifies that a trial judge's "discretion to admit the evidence is not to be sacrificed to a formalistic adherence to the standard we establish." 551 F.2d at 67. Accordingly, *Biggins* provides greater flexibility for authenticating evidence than *Alonzi* acknowledged. *See* Jordan S. Gruber, *Foundation for Audio Recordings as Evidence*, 23 Am. Jur. Proof of Facts 3d 315, § 34, Westlaw (database updated Aug. 2020) (explaining that *Biggins* departed from a strict, seven-part test for authenticating voice recordings and its "criteria are to be seen as a guideline and not as a rigid test"). In this way, *Biggins* foreshadowed the flexible approach of CRE 901.

¶37    *Baca*'s prerequisites for admitting a voice recording, however, do not track CRE 901. CRE 901(b) sanctions several methods for authenticating voice recordings. Although two such methods are "[t]estimony that a matter is what it is claimed to be," CRE 901(b)(1), and "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result," CRE 901(b)(9), CRE 901(b) states that these methods are "not by way of limitation." And CRE 901(b)(5) explicitly permits voice identification as a means of authentication "conforming with the requirements of this rule." CRE 901(b). Thus, according to CRE 901's plain language, the methods for authenticating a voice recording are not limited to the methods required by *Baca*.[5]

---

[5] We acknowledge that several federal circuits require proof that a voice recording is accurate or reliable for authentication. *See, e.g.*, *United States v. Oslund*, 453 F.3d 1048, 1054 (8th Cir. 2006) (providing factors for courts to consider in deciding whether a tape's "substance and the circumstances under which it was obtained" provide "sufficient proof of its reliability" when determining admissibility (quoting *United States v. Webster*, 84 F.3d 1056, 1064 (8th Cir. 1996))); *United States v. Panaro*, 266 F.3d 939, 951 (9th Cir. 2001) (explaining that to authenticate a voice recording, the trial court must be satisfied that the recording is "accurate, authentic, and generally trustworthy" (quoting *United States v. Mouton*, 617 F.2d 1379, 1383 (9th Cir. 1980))); *United States v. Doyon*, 194 F.3d 207, 212 (1st Cir. 1999) (requiring "proof that the tape recording accurately reflects the conversation in question" for authentication). But when articulating these rules, courts often cite to older precedent without engaging the language and examples of Federal Rule of Evidence 901(b). *See, e.g.*, *Oslund*, 453 F.3d at 1054; *Panaro*, 266 F.3d at 951; *Doyon*, 194 F.3d at 212. Like our rule, the federal rule lists several examples of evidence "that satisf[y] the requirement" of authentication, including an "opinion identifying a person's voice." Fed. R. Evid. 901(b)(5). Thus, while federal

¶38    This is not to say that *Baca*'s considerations are irrelevant.  If there is a valid question or claim that a voice recording has been manipulated or falsified, for example, a trial court might insist upon testimony from a percipient witness who can verify the recording's accuracy or evidence regarding the reliability of the recording process.   *Baca*'s considerations may then be pertinent in deciding whether there is enough evidence to justify a finding that the voice recording is what its proponent claims.  *See State v. Coston*, 215 A.3d 1285, 1288 (Me. 2019) ("In those instances where evidence of tampering is presented, the court will determine whether the proffered recording is so unreliable that it lacks an adequate foundation demonstrating that it is what it purports to be.").  But to the extent *Baca* holds there are two exclusive methods for authenticating a voice recording, we overrule *Baca*, and by extension, disagree with the defendant here.

¶39    In so doing, we join other courts that have adopted a more flexible approach for authenticating voice recordings.[6]  Like our court, several jurisdictions have

---

precedent supports *Baca*'s approach, we choose to adhere to the language of CRE 901.

[6] *See, e.g.*, Gruber, *supra*, § 34 (observing that today, "courts are typically emphasizing flexibility in foundation requirements. . . .  [A]lthough the 'seven-pronged' predicate (or the 'four-pronged' test from the *Biggins* case) may still be controlling law in a few jurisdictions, it is clear that strict adherence to 'ritualistic' foundation requirements has been abandoned" in better reasoned cases); 31 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 7110, Westlaw

recognized that adherence to a rigid formula for authentication does not comport with the more liberal requirements of the modern rules of evidence. *See, e.g.*, *United States v. Westmoreland*, 312 F.3d 302, 310 (7th Cir. 2002) (rejecting "the formalistic approach" of an earlier case embracing the *Biggins* factors "for the more inclusive approach of Federal Rule of Evidence 901(a)"); *State v. Jenkins*, 455 P.3d 779, 787, 788 (Kan. 2020) (overhauling the seven-factor foundation test for audio recordings in favor of "current Kansas rules of evidence and the cases interpreting them"); *cf. State v. Haight-Gyuro*, 186 P.3d 33, 36–37 (Ariz. Ct. App. 2008) (declining to adopt "a rigid, formulaic approach" for authenticating video recordings because the illustrations in Rule of Evidence 901(b) "do not foreclose any other method of authentication that would meet the requirement of Rule 901(a)"); *State v. Sassarini*, 452 P.3d 457, 468 (Or. Ct. App. 2019) (rejecting rigid application of a seven-factor test for authentication because a "more flexible approach to authentication is codified in [Oregon Rule of Evidence] 901").

---

(1st ed. database updated Apr. 2020) ("Most courts favor a more flexible approach, holding that a sound recording may be admitted where the evidence, taken as a whole, suggests that the recording is authentic. . . . Under this flexible approach, courts may require a more elaborate foundation only where the circumstances warrant, such as where the recording is indistinct or there is evidence that it may have been altered.").

¶40 Similarly, other jurisdictions have recognized that unbending, common-law approaches have been superseded by these rules. *See People v. Berkey*, 467 N.W.2d 6, 8, 10–11 (Mich. 1991) (concluding that a seven-part test for determining the admissibility of sound recordings "does not appear in the Michigan Rules of Evidence" and thus is "necessarily controlled by this Court's 1978 adoption of the rules"); *Stromas v. State*, 618 So.2d 116, 119 (Miss. 1993) (noting that a seven-factor test for authenticating tape recordings "has been supplanted by the Rules of Evidence and is no longer applicable to the admission of tape recordings").

¶41 And others still have observed that a formalistic approach does not account for the variety of factual circumstances that might arise. *See, e.g., United States v. Fuentes*, 563 F.2d 527, 532 (2nd Cir. 1977) (noting "the varying circumstances of particular cases . . . militate against our adoption of inflexible criteria [for authenticating tape recordings] applicable to all cases"); *cf. Haight-Gyuro*, 186 P.3d at 37 (concluding based on Rule 901 that "a flexible approach is appropriate, allowing a trial court to consider the unique facts and circumstances in each case . . . in deciding whether the evidence has been properly authenticated").

¶42 Even if *Baca*'s methods are not exclusive, Gonzales maintains that a proponent must make some showing that the recording is accurate. But the requisite showing under CRE 901(a), combined with rigorous cross-examination, sufficiently assures accuracy to submit the question of authenticity to the jury.

17

Recall that the standard for authentication is minimal—all that's required is a prima facie showing that the evidence is what its proponent claims. *Glover*, ¶ 13, 363 P.3d at 740; *see also Sassarini*, 452 P.3d at 469. A proponent does not need to "disprove any possibility of tampering" to establish an adequate foundation. *Coston*, 215 A.3d at 1288; *see also United States v. Savarese*, 686 F.3d 1, 11 (1st Cir. 2012) ("The burden of authentication, however, 'does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be.'" (quoting *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994))). The ultimate determination of whether a recording is authentic rests with the jury. *Glover*, ¶ 13, 363 P.3d at 740; *Sassarini*, 452 P.3d at 469 ("[T]he matter of authenticity is one for the ultimate factfinder at trial, not a preliminary ruling by the court.").

¶43 In sum, when offering a voice recording into evidence, the proponent need only provide evidence sufficient to support a finding that the voice recording is what he or she claims it to be. CRE 901(a). Testimony establishing the recording's accuracy or the reliability of the recording process, while relevant in some circumstances, is unnecessary in the ordinary course to authenticate a voice recording under CRE 901.

18

## D. The Voicemail Was Properly Admitted

¶44 With this flexible standard in mind, we conclude that the trial court did not abuse its discretion in admitting the voicemail at issue here.

¶45 The prosecution claimed that the voice recording was a phone message to F.C. from Gonzales. Before offering it into evidence, the prosecutor asked F.C.'s sister-in-law and a detective about the voicemail.

¶46 F.C.'s sister-in-law testified that she had found a microcassette tape in F.C.'s house when going through his belongings. She listened to the tape and, according to her, it was "quite obvious" that the tape was from a phone answering machine.

¶47 The detective who created a copy of the voicemail testified that the recording was a "phone message to [F.C.]." This detective had also previously interviewed Gonzales. He explained that he watched his interview with Gonzales, listened to Gonzales's voice, and listened to the voice in the voicemail. Based on this procedure, he concluded that the voice in the voicemail sounded "consistent or similar to Mr. Gonzales'[s] voice."[7] He also testified that the recording being offered into evidence was the same as that on the microcassette tape that F.C.'s

---

[7] Although Gonzales does not challenge the detective's familiarity with his voice, courts have held that "minimal familiarity" with a speaker's voice is sufficient to authenticate a voice recording under the federal counterpart to CRE 901(b)(5). *See, e.g.*, *United States v. Trent*, 863 F.3d 699, 707 (7th Cir. 2017); *United States v. Bush*, 405 F.3d 909, 919 (10th Cir. 2005).

sister-in-law gave to the police. Furthermore, there was no evidence suggesting the tape had been tampered with or falsified.

¶48 In the absence of a colorable claim of tampering, identifying the voice in the voicemail as Gonzales's was sufficient to authenticate the voicemail under CRE 901(b)(5). Moreover, that identification, in conjunction with the testimony from the detective and F.C.'s sister-in-law, sufficed to support a finding that the recording was what the prosecution claimed—a voicemail to F.C. from Gonzales. Accordingly, the trial court did not abuse its discretion in admitting the voicemail.

## III. Conclusion

¶49 We affirm the judgment of the court of appeals.