22CA1084 Peo v Albritton 08-29-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA1084 Jefferson County District Court No. 21CR1581 Honorable Lily W. Oeffler, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Phillip Marcus Albritton, Defendant-Appellant. JUDGMENT AFFIRMED Division V Opinion by JUDGE BERGER* Brown and Lum, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 29, 2024 Philip J. Weiser, Attorney General, Lane Towery, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, John P. Finnegan, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant *Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024. 
1 ¶ 1 Defendant, Phillip Marcus Albritton, appeals his convictions for attempted first degree assault, felony menacing, and third degree assault. He challenges the search warrant for his cell phone under the Fourth Amendment, jury unanimity, the admission of records from his cell phone based on hearsay and confrontation, and the admission of his Google searches as unfairly prejudicial character evidence. We address and reject all of these claims and therefore affirm. I. Relevant Facts and Procedural History ¶ 2 Viewing the evidence presented at trial in the light most favorable to the verdicts, the jury was entitled to find the following facts. ¶ 3 Albritton and Anya Burk dated until late April 2021. Two months later, on June 17, 2021, Burk went to a park with her former boyfriend, Seamus Johnson. Burk did not tell Albritton that she was going to the park with Johnson. But while Burk and Johnson were there, Albritton drove into the park, made eye contact with Burk and Johnson, and drove away. Burk told Johnson that the driver was her ex-boyfriend. Johnson and Burk decided to go to a different park. 
2 ¶ 4 While driving to the new park, Johnson received text messages from an unknown number saying, “[Y]ou fucking cheating ass bitch I swear to God I hate you. I’m sending my brother over there Seamus,” and “[W]hy don’t you come back to the park and have a conversation with me.” Johnson also received a voice call from the same phone number, but he did not answer the phone. ¶ 5 Shortly after Johnson and Burk arrived at the second park, Albritton sped into the parking lot, nearly hitting Johnson and Burk. Albritton left his vehicle and charged Johnson, holding a knife. Albritton followed Johnson, saying that he was going to “kill” him. Johnson tripped, and Albritton caught up to him, putting him in a headlock. Albritton held the knife up to Johnson’s neck, twice saying “get down on the ground or else I will slit your throat.” Johnson managed to get away. ¶ 6 Johnson then ran around to the trunk of his vehicle to grab a rifle he had stored inside. Before Johnson could retrieve the gun, Albritton grabbed an ice auger from Johnson’s trunk and threw it at Johnson, missing him. Johnson was then able to get ahold of his rifle and pointed it at Albritton, threatening him. Albritton then got in his car and drove away. 
3 ¶ 7 The police were called and, about an hour later, located Albritton and arrested him. Officers seized his phone at the time of his arrest. ¶ 8 Albritton was charged with attempted first degree murder, attempted first degree assault, felony menacing, and third degree assault. ¶ 9 The jury acquitted Albritton of attempted murder but convicted him of attempted first degree assault, menacing, third degree assault, and other lesser charges. He was sentenced accordingly. II. Analysis A. General Warrant ¶ 10 Albritton argues that the trial court reversibly erred by failing to suppress evidence obtained from his phone. He contends that the warrant was a “general” warrant that failed to establish probable cause and thus violated the Fourth Amendment. He also claims that the warrant was not sufficiently particular to meet Fourth Amendment requirements. 
4 1. Additional Facts ¶ 11 The police obtained a search warrant to search Albritton’s phone for the following: • “Data which tends to show possession, dominion and control over said equipment”; • “Passwords, encryption keys, codes, and/or other devices or information that may be necessary to access the device and its contents”; • “Date/time, language, and other settings preferences to include wireless local area network setting(s), Bluetooth settings to include device name(s), hotspot SSID (name), and MAC address and connection dates and times to the device”; • “System and device usage files, logs, and databases utilized to record device activities such as lock/unlock activities, powering on/off cycles, installation and deletions records”; • “Telephone contact lists, phone books, telephone logs, MMS SMS message” from June 17, 2021; • “Data contained in notes, reminders, documents, calendars and/or other similar applications that relates to the 
5 planning and commission of the attempted 1st Degree Murder that occurred on 06/17/21” from June 17, 2021; • “Communications made, stored, sent, received or deleted that relate to the planning and commission of the attempted 1st Degree Murder that occurred on 06/17/21” from June 17, 2021; • “Photos and videos created, stored, sent, received or deleted, or documents containing such photographs or videos that relate to the planning and commission of attempted 1st Degree Murder that occurred on 06/17/21”; • “All electronic files, data, videos, and communications, including related metadata and location data, stored, sent, received or deleted from social media and third-party applications located on the device that relate to the planning and commission of the attempted 1st Degree Murder that occurred on 06/17/21”; • “Global position system (GPS) data and any other geolocation data that relates to the planning and commission of the attempted 1st Degree Murder that occurred on 06/17/21” from June 17, 2021; and 
6 • “Records of internet activity that relates to the planning and commission of the attempted 1st Degree Murder that occurred on 06/17/21” from June 17, 2021. ¶ 12 Albritton moved to suppress most of the evidence obtained by the warrant. ¶ 13 The trial court denied the suppression motion. It determined that there was probable cause to search the phone because the officers reasonably believed that Albritton was using his phone to track and communicate with the victim on the day of the attack. It also concluded that the warrant was limited to one date, June 17, 2021, thus satisfying the Fourth Amendment’s particularity requirement. 2. Probable Cause ¶ 14 Albritton contends that the affidavit failed to establish probable cause to search anything except Albritton’s text messages, phone log, and Snapchat. ¶ 15 The Warrant Clause of the Fourth Amendment to the United States Constitution protects people from unreasonable searches and seizures. It states that “no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly 
7 describing the place to be searched, and the persons or things to be seized.” U.S. Const. amend. IV. The Colorado Constitution contains similar, though not identical, provisions in article II, section 7, which states that “no warrant to search any place or seize any person or things shall issue without describing the place to be searched, or the person or thing to be seized, as near as may be.”
1 ¶ 16 To establish probable cause, a warrant affidavit must “allege facts sufficient to cause a reasonably cautious person to believe that evidence of criminal activity” exists in the place to be searched. People v. Omwanda, 2014 COA 128, ¶ 21. We review the totality of circumstances to determine whether probable cause exists. People v. Miller, 75 P.3d 1108, 1113 (Colo. 2003). “This analysis does not lend itself to mathematical certainties or bright line rules; rather, it involves a practical, common-sense determination whether a fair 1 Albritton does not make any separate argument under the Colorado Constitution, so we limit our analysis to the Fourth Amendment. People v. Lewis, 2017 COA 147, ¶ 12 n.2 (“Where, as here, a defendant does not make a specific objection, with a separate argument, under the state constitution, we must presume the defendant’s objections are based on federal, not state, constitutional grounds, and limit our review accordingly.”) (citation omitted). 
8 probability exists that a search of a particular place will reveal contraband or other evidence of criminal activity.” Id. ¶ 17 The totality of the circumstances described in the warrant affidavit showed a fair probability that a search of the phone would reveal “evidence of criminal activity” such as text messages, call logs, internet searches, social media messages, and GPS data related to Albritton’s tracking of Johnson and Burk. See Omwanda, ¶ 21. ¶ 18 As for the particular categories of data to be searched on the cell phone, we reject Albritton’s (arguably conclusory) argument that the warrant and affidavit did not adequately establish probable cause. The categories to be searched were relevant to proving Albritton’s possession and usage of the phone on the day of the attack, as well as specific data stored on the phone that could be relevant to the planning and commission of the crime. ¶ 19 We conclude that, based on the facts alleged in the affidavit that Albritton used his phone in commission of the crime, there was more than sufficient probable cause for the police to search the phone for all the data categories listed in the affidavit. People v. Kazmierski, 25 P.3d 1207, 1211 (Colo. 2001) (affidavit must supply 
9 a sufficient nexus between criminal activity, the things to be seized, and the place to be searched). 3. Particularity ¶ 20 Next, Albritton argues that the court erred in determining that the warrant satisfied the Fourth Amendment’s particularity requirement. a. Standard of Review and Legal Principles ¶ 21 A trial court’s suppression ruling presents a mixed question of law and fact; thus, “[w]e accept the trial court’s findings of historic fact if those findings are supported by competent evidence, but we assess the legal significance of the facts de novo.” People v. Davis, 2019 CO 24, ¶ 14 (citation omitted). ¶ 22 A search conducted pursuant to a warrant is typically reasonable. People v. Coke, 2020 CO 28, ¶ 34. However, so-called “general warrants,” which permit “a general, exploratory rummaging in a person’s belongings,” are prohibited. Id. (quoting Andresen v. Maryland, 427 U.S. 463, 480 (1976)). To prevent general exploratory searches, the Fourth Amendment requires “a ‘particular description’ of the things to be seized.” Id. (quoting Andresen, 427 U.S. at 480). 
10 ¶ 23 In determining whether this requirement is met, “courts are required to read warrants and the accompanying affidavits [together] in a practical, common sense fashion.” People v. Roccaforte, 919 P.2d 799, 804 (Colo. 1996). ¶ 24 An affidavit submitted in support of a warrant may cure a warrant’s facial lack of particularity if (1) the deficient warrant incorporated the curative affidavit by reference; (2) both documents were presented to the issuing judge or magistrate; and (3) the curative affidavit accompanied the warrant during the execution of the search warrant. People v. Staton, 924 P.2d 127, 132 (Colo. 1996). b. Discussion ¶ 25 Relying on Coke, Albritton argues that the warrant does not contain a limiting principle and is thus invalid. He claims that the language in the warrant limiting the search only to data that “relates to” the June 17 incident is an insufficient limiting principle. We disagree. ¶ 26 In Coke, ¶ 1, the defendant was charged with sexual assault on a child. The police obtained a warrant to search the defendant’s cell phone for all texts, videos, pictures, contact lists, phone 
11 records, and any data showing ownership or possession. Id. at ¶¶ 35, 38. The Colorado Supreme Court held that the warrant violated “the particularity demanded by the Fourth Amendment” because it contained “no particularity as to the alleged victim or to the time period during which the assault allegedly occurred” and essentially “authorized a general search” of the defendant’s phone. Id. at ¶ 38. ¶ 27 Under Coke, broad searches may be sustained against particularity challenges if they include certain limiting principles. To be sufficiently particularized, warrants for the search of data on cell phones must include specific limitations based on (1) the type of alleged criminal activity; (2) the identity of the alleged victim; and (3) if applicable, the timeframe within which the suspected crime occurred. Id.; see also People v. Herrera, 2015 CO 60, ¶ 20. ¶ 28 The warrant here employed the limiting principles required by Coke. The warrant limited multiple categories to a specific crime, only allowing officers to search for data “related to the planning and commission of the attempted 1st Degree Murder that occurred on 06/17/21.” Other categories were additionally limited to the 
12 timeframe in which the suspected crime occurred, by including the language “limited to date of 06/17/21.” ¶ 29 We observe that both the warrant and the accompanying affidavit were comprehensive and meticulously drafted. Indeed, we do not see how the police could have been more specific, and Albritton offers no suggestions. These limiting principles circumscribed the search for evidence of a particular crime (the attempted murder against Johnson) committed on a particular day (June 17, 2021). Therefore, the warrant was valid under Coke and the Fourth Amendment. ¶ 30 Albritton also argues that the court erred in assuming that the warrant was looking at only one date, June 17, 2021. He argues that some of the categories were not limited to a date range. We agree that some categories in the warrant do not contain an explicit limitation to a date or crime. However, we must read the warrant and accompanying affidavit in a practical commonsense fashion. Roccaforte, 919 P.2d at 804. ¶ 31 The affidavit clearly states that [t]he date range of the information requested for the search warrant requested is limited to only 06/17/21 (Mountain Standard Time) to 
13 determine if communication took place regarding the attempted 1st Degree Murder. [Albritton] is believed to have been sending messages to the victim just prior to attempting to stab the victim. (Emphasis added.) ¶ 32 Thus, a commonsense reading of the warrant and accompanying affidavit together clearly indicates that the warrant was limited to June 17, 2021, the day the alleged crime occurred. See Roccaforte, 919 P.2d at 804 (a warrant that permitted a search for all records pertaining to a business, including electronically stored data, satisfied the particularity requirement because the supporting affidavit narrowed the search to business documents pertaining to particular dates that were related to a particular crime). ¶ 33 Further, even if the warrant itself was insufficient in any way, we conclude that all three Staton factors exist here to cure any deficiencies. First, the warrant explicitly says that it incorporates the supporting affidavit. Staton, 924 P.2d at 132. Second, that language, as well as the district court’s signature on the warrant application and affidavit, indicates that the court had the affidavit before it when it signed the warrant. Id. Third, the fact that the 
14 warrant and supporting affidavit are contained in a single, continuously paginated document indicates that the affidavit accompanied the warrant when it was executed by the judicial officer. Id. Indeed, the forensic analyst who generated the report from the cell phone data testified that she selected the “limited date from the search warrant.” ¶ 34 In sum, we conclude that even though some categories of the search warrant did not contain an explicit limiting principle, the supporting affidavit cured any deficiency, and the warrant therefore met the Fourth Amendment’s particularity requirement. People v. Terhorst, 2015 COA 110, ¶ 24 (“We may affirm a denial of a suppression motion ‘on any basis for which there is a record sufficient to permit conclusions of law, even though they may be on grounds other than those relied upon by the trial court.’” (quoting Moody v. People, 159 P.3d 611, 615 (Colo. 2007))). The court correctly denied the motion to suppress. B. Jury Unanimity and Variance ¶ 35 Next, Albritton contends that the trial court plainly erred in not requiring the prosecution to elect or provide a modified unanimity instruction because the prosecutor presented evidence of 
15 multiple weapons that could have supported his assault and menacing convictions. He argues that this created a prejudicial variance that rendered the jury’s verdict for the assault and menacing charges not unanimous. His arguments appear to conflate the requirement of jury unanimity with the principles that prohibit variances. Accordingly, we address both in turn. 1. Standard of Review ¶ 36 We agree with the parties that this claimed error was unpreserved; therefore, we review any error under the plain error standard and reverse only if the error is obvious and so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. People v. Rediger, 2018 CO 32, ¶ 48. 2. Jury Unanimity ¶ 37 A jury’s verdict must be unanimous. § 16-10-108, C.R.S. 2024. “Unanimity means only that each juror agrees that each element of the crime charged has been proved to that juror’s satisfaction beyond a reasonable doubt.” People v. Linares-Guzman, 195 P.3d 1130, 1134 (Colo. App. 2008). 
16 ¶ 38 When the prosecution presents evidence of multiple discrete acts, each one of which could constitute the offense charged, and jurors are reasonably likely to disagree about which act the defendant committed, the court must either require the prosecution to elect a particular act or instruct the jury that it must agree that the defendant committed the same act or acts or all of the acts. People v. Archuleta, 2020 CO 63M, ¶¶ 21-22. But if the defendant is charged with multiple criminal acts occurring in a single transaction, neither an election of acts nor a modified unanimity instruction is required. People v. Hines, 2021 COA 45, ¶ 50. ¶ 39 We review de novo whether a court erred by failing to require an election or provide a unanimity instruction. People v. Wagner, 2018 COA 68, ¶ 38. ¶ 40 Albritton claims that the prosecution charged him with the single transaction of assaulting and menacing Johnson with a knife because the complaint specified that he committed both crimes “by means of a deadly weapon, namely: knife.” But at trial, the prosecution introduced evidence that Albritton attacked Johnson with other weapons, including an ice auger and his hands. So, his argument goes, the prosecution introduced evidence of multiple 
17 acts that the jury could have separately, and non-unanimously, based the conviction on. To cure the possibility of a non-
unanimous verdict, he contends that the court should have either required the prosecution to elect the knife as the deadly weapon, as it did in the complaint, or give a modified unanimity instruction to the jury. ¶ 41 We disagree with Albritton that three separate acts occurred — the attack with the knife, throwing the ice auger, and the chokehold. Instead, we conclude that these acts were part of a single criminal transaction because they involved the same victim; occurred in the same location; occurred within a short period of time; and were part of a single, ongoing violent attack. See People v. Hanson, 928 P.2d 776, 779-80 (Colo. App. 1996) (finding, in a menacing case, that two separate confrontations with the same victim, in the same location, within a short period of time, and arising out of the same circumstances constituted a single transaction). When the acts are part of a single transaction, no election or special unanimity jury instruction is required. Hines, ¶ 50. Thus his jury unanimity argument fails. 
18 3. Simple Variance ¶ 42 Albritton also argues that the difference between the charging document and the conviction created a prejudicial simple variance requiring reversal of his convictions. We disagree. ¶ 43 A variance occurs when the charge contained in the charging instrument differs from the charge for which a defendant is convicted. Campbell v. People, 2020 CO 49, ¶ 45. There are two types of variances — a simple variance, which occurs when the charging terms are unchanged, but the evidence proves facts materially different from those alleged in the charging document, and a constructive amendment, which changes an essential element of the charged offense, thereby altering the substance of the charging document. People v. Rice, 198 P.3d 1241, 1245 (Colo. App. 2008). A constructive amendment may be per se reversible, but a simple variance does not require reversal unless it prejudices the defendant’s substantial rights. Id. ¶ 44 Initially, we do not see a material discrepancy between the facts introduced at trial and those contained in the indictment, as 
19 required for a simple variance.
2 The charging document claimed that Albritton assaulted and menaced Johnson with a deadly weapon — namely, a knife — and the evidence presented at trial was entirely consistent with the charging document. The evidence showed that Albritton chased Johnson with a knife in his hand and held it up to Johnson’s throat while saying he would kill him. ¶ 45 But even if a simple variance occurred because the evidence also showed that Albritton threw an ice auger at Johnson and put Johnson in a chokehold, Albritton fails to demonstrate any prejudice that would warrant reversal. Albritton does not argue that he was deprived of notice or would have presented a different defense if he had known that the prosecution would introduce evidence of the other weapons. Id. at 1247. Therefore, even if there was a simple variance, reversal is not appropriate. 2 Albritton argues that a simple variance occurred. He does not claim that there was a constructive amendment of the charging document, so we limit our analysis to a simple variance. 
20 C. Cell Phone Records ¶ 46 Next, Albritton contends that the court admitted unauthenticated hearsay evidence in violation of the rules of evidence and the Confrontation Clause. 1. Background ¶ 47 After the warrant to search Albritton’s cell phone was issued, the police retrieved the cell phone that had been seized from Albritton and delivered it to the crime lab. A digital forensic analyst with the Lakewood Police Department received a request from the police to extract data from Albritton’s phone. The analyst obtained the phone, placed it in a Faraday enclosure and then determined that the forensic software owned by the crime lab was not compatible with Albritton’s phone.
3 Following established procedures, the analyst sent the device to Cellebrite, a private vendor of computer services, to extract the data. ¶ 48 The analyst testified that, while she did not know Cellebrite’s exact process for how they acquire data, the process was “essentially the same” as her lab’s in that the phone is connected to 3 A Faraday enclosure is a device that prevents the transmission of radio or other electronic signals from or to the phone. 
21 a computer, the data is extracted and encrypted, and it is saved on a thumb drive. ¶ 49 The analyst testified that she received the phone as well as a thumb drive containing the extraction from Cellebrite. The prosecution asked the analyst if she “reviewed” the extraction. She replied that no, she did not “review” it. Rather, the extraction was “imported into a Physical Analyzer,” another computer program owned by the crime lab. The “limited date range from the search warrant was selected, and a report was generated.” ¶ 50 The prosecution offered and the trial court admitted the following evidence through the analyst without objection: a spreadsheet reflecting Albritton’s app use and internet searches; Albritton’s social media activity on June 17, 2021; and a report of installed applications from June 17, 2021, showing that Albritton purchased the app “TextNow.” The analyst read into evidence the search history from Albritton’s phone, including Google searches of “I’m already in hell” and “Seamus Johnson.” ¶ 51 On cross-examination, defense counsel asked the analyst whether Cellebrite “generated the report” that she analyzed. She clarified that no, Cellebrite did not “create the report,” but instead 
22 Cellebrite created the “software or the tool that, then, was used to parse out the data that was received from them to create the limited report.” ¶ 52 Albritton contends that the admission of this evidence was error because the reports were (1) not properly authenticated and (2) constituted inadmissible hearsay. 2. Standard of Review ¶ 53 Albritton did not preserve his authentication or hearsay objections; thus we review those claims only for plain error. See People v. Allgier, 2018 COA 122, ¶ 30. 3. Authentication ¶ 54 Under CRE 901(a), evidence must be authenticated before it may be admitted. “[T]he standard for authentication is minimal — all that’s required is a prima facie showing that the evidence is what its proponent claims.” Gonzales v. People, 2020 CO 71, ¶ 42. Thus, the proponent of evidence is only required to offer “a satisfactory foundation from which the jury could reasonably find that the evidence is authentic.” Id. at ¶ 27 (quoting People v. Glover, 2015 COA 16, ¶ 13). 
23 ¶ 55 Electronic evidence may be authenticated through the testimony of a witness with knowledge that the evidence is what it is claimed to be and through circumstantial evidence. People v. Abad, 2021 COA 6, ¶ 17. Specifically, electronically generated printouts may be authenticated through the testimony of a person who has personal knowledge of how the printouts were generated and that they are what they are claimed to be. People v. Hamilton, 2019 COA 101, ¶ 36. ¶ 56 In Abad, ¶¶ 22-47, a division of this court held that a trial court had not abused its discretion — or, at the very least, had not plainly erred — by admitting testimony about extraction reports, similar to the ones here. In Abad, the prosecution offered evidence from extraction reports of data extracted from two cell phones using Cellebrite software. Id. at ¶¶ 23-37. The detective who performed the extractions didn’t testify at trial, but a detective who assisted with one of the two extractions testified that the police had downloaded the data using the same process they used in every other case, and another detective testified about the department’s use of Cellebrite software for several years. Id. at ¶¶ 23-25, 44. The Abad division concluded that, “[g]iven the minimal showing 
24 required by CRE 901,” the testimony was sufficient for authentication purposes. Id. at ¶ 45. ¶ 57 Like the Abad court, we conclude that the trial court’s admission of the extraction reports and the analyst’s testimony were not error. The analyst had personal knowledge of how the reports were generated and how the extraction process generally works at Cellebrite, and she testified as to what the electronically generated printouts were and what they claimed to be. Thus, the evidence was sufficiently authenticated to be presented to the jury. See Hamilton, ¶ 36; see also People v. Sutherland, 683 P.2d 1192, 1197-98 (Colo. 1984) (in the absence of evidence suggesting a lack of authenticity, the evidence proponent does not have to present testimony from each person who handled the evidence). ¶ 58 In any event, any possible error was not plain under Hamilton. In Hamilton, ¶ 9, a detective testified that the police department personnel downloaded the contents of multiple phones and generated reports reflecting the phones’ contents. At trial, the prosecutor did not seek to introduce the reports into evidence or call as witnesses the employees who examined the phones or generated the reports. Id. Instead, the detective testified that, 
25 based on his review of the reports, neither phone contained text messages between the defendant and victim. Id. ¶ 59 While Hamilton was binding on the trial court at the time of the trial, it is distinguishable. Unlike in Hamilton, where the State failed to call as a witness any employee who examined the phones or generated the reports, the prosecution here presented testimony from the analyst, who generated the reports using the extraction data and who had personal knowledge of the extraction process. Thus, even if any authentication error occurred, it would not have been obvious under Hamilton. 4. Hearsay ¶ 60 Albritton next contends that the court erred in admitting the reports because the prosecution did not establish that the “source of the data was independent of human observation and reporting.” Thus, he argues, the reports were inadmissible hearsay. Again, we disagree. ¶ 61 Hearsay evidence is not admissible except as provided by the Colorado Rules of Evidence or other rules or statutes. CRE 802. Hearsay is “a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the 
26 truth of the matter asserted.” CRE 801(c). But a statement that is offered for other purposes — such as to show the statement’s effect on the listener or to give context to a defendant’s statements — is not offered for its truth and therefore is not hearsay. Abad, ¶ 52. ¶ 62 Moreover, information automatically generated by machines is not hearsay because no “declarant” made a “statement” within the meaning of CRE 801. Id. at ¶ 54. ¶ 63 The division in Abad also concluded that the extraction reports in that case were not hearsay because the detectives’ testimony established that the reports were “produced automatically without human intervention.” Id. at ¶¶ 55-56. Specifically, the witness testimony showed that “[t]he reports [did] not require any human input short of plugging the phone into a machine.” Id. at ¶ 55. ¶ 64 This case is distinguishable from the facts in Hamilton, where the prosecution failed to offer evidence to show that the reports were generated without human input or interpretation and were thus hearsay. Abad, ¶ 56 n.5; see also Hamilton, ¶ 26. 
27 ¶ 65 Here, the analyst presented testimony to establish that the reports were generated without human input or interpretation. She testified that • the extraction process is done by connecting a phone to software; • she does not review the extraction, but rather imports the extraction data into a Physical Analyzer; • she selected a limited date range from the search warrant, and the software generated a report; and • Cellebrite does not create reports. ¶ 66 Thus, the reports here, like the ones in Abad, are not hearsay, and the court did not err in admitting them. ¶ 67 Even if there was hearsay error in admitting the reports, given the testimony of the analyst, the admission of the reports was a close call and thus not obvious. This precludes a finding of plain error. ¶ 68 Because we determine that the evidence was not hearsay, we do not reach Albritton’s claim that the evidence violated his right to confrontation. There cannot be a Confrontation Clause violation if the offered evidence does not constitute hearsay. Because the 
28 challenged testimony was not hearsay, the Confrontation Clause challenge necessarily fails. Smith v. Arizona, 602 U.S. ___, ___, 144 S. Ct. 1785, 1801 (2024). And even if there were any Confrontation Clause error, we find no plain error for the same reason that the admission of the reports was not reversible based on a hearsay violation. D. Character Evidence ¶ 69 Lastly, Albritton contends that the trial court reversibly erred in admitting unfairly prejudicial character evidence. 1. Additional Facts ¶ 70 On the day of the attack, Albritton made numerous Google searches about serial killers and suicide assistance. He specifically searched the name “Seamus Johnson” (the victim) followed by “I’m going to hell” and “I’m already in hell” a few hours later. ¶ 71 Albritton sought to exclude the Google search history as impermissible prior bad act evidence. The court excluded the serial killers searches under CRE 403. It admitted, however, the “hell” searches. It found that the evidence was not character evidence, so it was presumptively admissible. It also concluded that the searches were contemporaneous with the attack on Johnson and 
29 occurred close in time to when Albritton searched “Seamus Johnson.” It thus concluded that the searches were intrinsic to proving the elements of the offense, because the searches indicated a consciousness of guilt. ¶ 72 The prosecution offered testimony that Albritton made the “hell” searches on the day of the incident. The prosecution referenced the “hell” searches during closing argument to demonstrate Albritton’s intent to commit attempted first degree murder (of which Albritton was acquitted) and that he had a “guilty conscience.” ¶ 73 On appeal, Albritton argues that the trial court erred by not engaging in a CRE 404(b) and People v. Spoto, 795 P.2d 1314 (Colo. 1990), analysis before admitting the “hell” searches and that the error was not harmless. 2. Standard of Review and Legal Principles ¶ 74 Albritton preserved the issue through his motion in limine. Martinez v. People, 2015 CO 16, ¶ 14. “A court’s erroneous decision to admit evidence of other acts under CRE 404(b) is subject to the nonconstitutional harmless error standard.” People v. Brown, 2014 COA 130M, ¶ 6. 
30 ¶ 75 In light of Rojas v. People and the abolishment of the res gestae doctrine in criminal cases, a trial court must first determine if the evidence of uncharged misconduct is intrinsic or extrinsic to the charged offense. 2022 CO 8, ¶ 52. Intrinsic acts are those (1) that directly prove the charged offense or (2) that occurred contemporaneously with the charged offense and facilitated the commission of it. Id. Evidence of acts that are intrinsic to the charged offense are exempt from CRE 404(b) because they are not “other” crimes, wrongs, or acts. Id. Extrinsic evidence, however, if suggestive of bad character, is admissible only as provided by CRE 404(b) and after a Spoto analysis. Id. ¶ 76 It is presently unclear whether consciousness of guilt evidence is either intrinsic or extrinsic, or whether that categorization depends on the particular facts. It is clear that consciousness of guilt evidence is properly admitted under CRE 404(b). People v. Medina, 51 P.3d 1006, 1013 (Colo. App. 2001), aff’d sub nom. Mata-
Medina v. People, 71 P.3d 973 (Colo. 2003). ¶ 77 Initially we agree with the trial court that the “hell” searches were not evidence of a “crime, wrong, or act” under CRE 404(b) and were thus presumptively admissible subject to relevance and CRE 
31 403. But to complete our analysis, we assume, without deciding, that the “hell” searches were extrinsic evidence and consider whether the searches are admissible under Spoto.
4 ¶ 78 To be admissible under CRE 404(b), the evidence must meet each of the four prongs detailed in Spoto. 795 P.2d at 1318. First, the “hell” searches must relate to a material fact. Id. Second, they must be logically relevant. Id. Third, their logical relevance must be independent of the prohibited inference that Albritton acted in accordance with his poor character. Id. And fourth, the searches’ relevance must not be substantially outweighed by their potential prejudice in violation of CRE 403. Id. 3. Discussion ¶ 79 Regarding the first factor, the “hell” searches directly related to the material facts concerning Albritton’s mental state and consciousness of guilt at the time of the alleged crimes. The 4 Any error in admitting the evidence does not require reversal if the evidence meets the foundational CRE 404(b) and Spoto requirements. People v. Martinez, 36 P.3d 154, 158 (Colo. App. 2001); People v. Cousins, 181 P.3d 365, 370 (Colo. App. 2007) (“A conviction will not be overturned on appeal when the trial court employed an erroneous standard in analyzing the admissibility . . . [if the] evidence [is] admissible, and the proper foundation [was] laid for its admission.”). 
32 searches occurred a few hours after Albritton searched “Seamus Johnson” but before he allegedly assaulted Johnson. A jury could properly conclude that the searches indicate that Albritton knowingly planned to harm Johnson, a fact obviously relevant to the required mental states for at least some of the crimes alleged. Thus, the evidence related to material facts concerning its admissible purpose and met prong one of the Spoto test. See Yusem v. People, 210 P.3d 458, 464 (Colo. 2009) (“[The first Spoto] prong considers not the substance of the prior act evidence, but the fact in the case for which the evidence is offered to prove.”). ¶ 80 Next, for similar reasons, the evidence was logically relevant to key issues at trial and made the existence of these facts more probable than without the evidence. The searches illustrated Albritton’s consciousness of guilt and made it more likely that he knowingly attacked and harmed Johnson. ¶ 81 Third, the evidence revealed Albritton’s consciousness of guilt independent of impermissible character evidence. Even if the search itself about going to hell suggested that he acted in accordance with “bad character,” its relevance is independent of that inference because the search is an indication of how he felt 
33 about the specific harm he was going to commit against Johnson. See People v. Snyder, 874 P.2d 1076, 1080 (Colo. 1994) (“The third prong of the Spoto test does not demand the absence of the inference but merely requires that the proffered evidence be logically relevant independent of that inference.”). ¶ 82 Finally, the relevance of the “hell” searches was not substantially outweighed by its risk of unfair prejudice. “The Colorado Rules of Evidence strongly favor the admission of evidence, and the trial court has broad discretion in determining the admissibility of evidence.” Medina, 51 P.3d at 1017. “Because the balance required by CRE 403 favors admission, a reviewing court must afford the evidence the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected.” People v. Rath, 44 P.3d 1033, 1043 (Colo. 2002). ¶ 83 The searches were highly probative of Albritton’s consciousness of guilt and his mental state at the time he attacked Johnson. While all relevant evidence is prejudicial in an expansive sense, there was no unfair prejudice. This evidence did not suggest 
34 to the jury that Albritton was a bad person acting in conformity with his propensity to do bad acts. ¶ 84 Because the evidence meets the foundational requirements of CRE 404(b) and Spoto, any error that occurred by the trial court not conducting this analysis does not merit reversal. See Cousins, 181 P.3d at 370. Because the evidence also meets the criteria for admissibility under CRE 401 and 403, any error in the trial court’s failure to conduct this analysis was harmless. Martinez, 36 P.3d at 158.
5 ¶ 85 For similar reasons, even if we assume that the admission of these searches was error, the failure to give a limiting instruction was also harmless and does not justify reversal. III. Disposition ¶ 86 The judgment of conviction is affirmed. 5 We reject the Attorney General’s argument that any error in the admission of the “hell” searches was harmless because that evidence applied only to the first degree murder charge, of which Albritton was acquitted. The required mental state for attempted first degree assault (intent to cause serious bodily injury to another) is similar, though not identical, to the required mental state for attempted first degree murder (after deliberation and with intent to cause death to another). Thus, the distinction offered by the Attorney General does not withstand scrutiny. 
35 JUDGE BROWN and JUDGE LUM concur.